**METROPOLITAN VAN AND STORAGE, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**v.**

**Guardian Moving and Storage Co., Inc., Defendant–Intervenor.**

**No. 09–473C.**

United States Court of Federal Claims.

March 30, 2010.

Redacted Version Issued for Publication: April 16, 2010.[1]

1. This opinion was issued under seal on March 30, 2010. The parties proposed redactions to the opinion, which were incorporated into this version, and reflected in the text of the opinion with "[deleted]." The court made additional conforming redactions for consistency.

Joseph G. Billings, Miles & Stockbridge PC, Baltimore, MD, for the plaintiff. With him were Nathan D. Hartland and Rita J. Piel, Miles & Stockbridge PC, Baltimore, MD, of counsel.

Christopher L. Krafchek, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director, Commercial Litigation Branch, and Tony West, Assistant Attorney General.

Grace Bateman, Seyfarth Shaw LLP, Washington, D.C., for the intervenor. With her were Joshua C. Drewitz and Daniel P. Wierzba, Seyfarth Shaw LLP, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

## FINDINGS OF FACT

This case involves a post-award bid protest brought by Metropolitan Van and Storage, Inc. (MVS). The case is before the court on the parties' cross-motions for judgment on the administrative record. On May 9, 2008, the Military Surface Deployment and Distribution Command (SDDC) issued Request for Proposals [RFP] W81GYE-08-R-0006 (the solicitation) for the storage and management of household goods and unaccompanied baggage for the Department of Defense on the West Coast of the United States (the West Coast Contract). Household goods and unaccompanied baggage on the West Coast are processed through the Port of Oakland before being transported to a contractor's storage facility. The contract to be awarded was an indefinite delivery/indefinite quantity (IDIQ) contract for one base year with the possibility of six option years and one thirty month transition option, totaling nine and a half years. The solicitation provided a minimum guaranteed storage amount of 5% of the base period contract award. Under the original solicitation and subsequent amendments to the original solicitation, the contract was awarded twice to Guardian Moving and Storage Co., Inc. (Guardian). Guardian is the defendant-intervenor in this case. MVS was the incumbent contractor for storage and management of household goods and unaccompanied baggage for the Department of Defense on the West Coast of the United States on an earlier contract awarded in November 2003, effective in March 2004.

The solicitation stated,

> [t]his is a low price technically acceptable Request for Proposal with a Past Performance Evaluation. An award will be made to the responsible low priced technically acceptable offeror with acceptable past performance. In the event that the low priced offeror is technically acceptable and

has an acceptable past performance rating, award shall be made to that offeror. No other proposals will be considered for award at this point and the evaluation process will end.

The evaluation factors in the solicitation were: Cost/Price, Technical and Past Performance, with the award "made to the responsible low priced technically acceptable offeror with acceptable past performance." The Cost/Price Evaluation factor was evaluated for the total overall cost of the nine and a half years of potential performance, based on the offeror's price proposal and informational drayage cost, i.e., the cost to transport the household goods and unaccompanied baggage from the Port of Oakland to the offeror's warehouse facility. The greater the distance an offeror's warehouse is from the Port of Oakland, the greater the drayage charge and, therefore, the greater the dollar amount that is added to the offeror's price for the purpose of price evaluation. Price proposals were to be analyzed for reasonableness and completeness and could include a comparison of the offeror's proposed prices to those of the other offerors, to prices paid under the same or similar contracts and to other relevant data. The solicitation indicated that a price proposal found to be unrealistically low may reflect a lack of understanding of the solicitation requirements by the offeror.

For the Technical Evaluation factor, there were five sub-factors: (1) verification from a qualified engineer or authority that the facility does not fall within a 100-year flood plain; (2) certificate of warehouseman's legal liability insurance; (3) proof of a fire system maintenance contract; (4) evidence of maintaining a primary and secondary locator system that shows identification of lots stored; and (5) proof of ownership, lease or written commitment for sufficient warehouse space. Technical proposals were to be evaluated on a pass/fail basis, with the offeror required to receive an acceptable Pass rating on all five of the Technical Evaluation sub-factors. For the Past Performance Evaluation factor, the solicitation stated that SDDC would conduct a risk assessment based upon the offeror's past performance as it related to the accomplishment of the required effort. For the Past Performance factor, Pass was defined as Low/Moderate Risk, i.e., based on offeror's past performance history, little or no doubt exists that the offeror would successfully perform the required work; and Fail was defined as High Risk, i.e., based on an offeror's past performance history, extreme doubt exists that the offeror would successfully perform the required work. The solicitation cautioned offerors that "in conducting the performance risk assessment, the government may use data provided by the offeror in its proposal and data obtained from other sources."

The Basis for Award in the solicitation stated that offerors must submit "adequate documentation that supports the factors and sub-factors" outlined in the solicitation and that "[d]ocumentation shall demonstrate a clear understanding of, and the ability to, accomplish the requirements stated in the Performance Work Statement (PWS)." Section 3.1 of the Performance Work Statement required that the awardee either own or have a lease agreement for a storage facility in effect for the potential maximum performance period of the contract, including all potential option periods. Section 3.1 of the Performance Work Statement also required that within ten work days after award, the awardee must submit a layout diagram showing the storage space owned or leased by the contractor, as "space sufficient to store up to 15 million (15,000,000) gross pounds of personal property lots annually," with "firewall separation for every three (3) million gross pounds of stored personal property lots," and that the space had been reviewed, signed off on and dated by an official of the local fire department. The Performance Work Statement also required the contractor to use the Defense Transportation Regulation and the Defense Department Personal Property Transportation Guide, as well as other applicable government regulations.

A number of Amendments to the solicitation were issued, including Amendment 0003, which was a series of questions and answers from the pre-proposal conference held on May 29, 2008. One question asked, "[h]ow much warehouse space is needed?" SDDC replied, "See RFP [Request for Proposals]

PWS Section 3.1. The Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually." The solicitation also incorporated Federal Acquisition Regulation [FAR] 52.216–19, "Order Limitations (Oct.1995)," which stated a contractor would not be obligated to accept for storage a single item that exceeds 6 million pounds, a combination of items that exceeds 14 million pounds, or a series of orders over a period of 30 days from the same ordering office that together exceeds the 6 million or 14 million pound limits.

Guardian is the incumbent contractor on two East Coast storage contracts (the East Coast Contracts) for SDDC, one in Baltimore, Maryland, contract no. DAMT01–02–D–0030 (the Baltimore, Md. Contract), and one in Hampton, Virginia, contract no. W81GYE–07–D–0021 (the Hampton, Va. Contract). The contracting officer for the solicitation, who evaluated price and past performance for the solicitation at issue, also was the contracting officer for the East Coast Contracts with Guardian. The East Coast Contracts, like the West Coast Contract solicitation, included the requirement to utilize the Transportation Operational Personal Property Standard system (TOPS) to process non-temporary storage, personal property. Guardian's Hampton, Va. Contract, like the West Coast Contract, was an IDIQ contract, with a low price/technically acceptable basis for award. The services required and the evaluation criteria for Guardian's Hampton, Va. Contract were virtually identical to the evaluation criteria in the West Coast Contract at issue, including the requirement to provide "[p]roof of ownership, lease or written commitment for sufficient warehouse space."

Section 3.1 of the Performance Work Statement of the Hampton, Va. Contract is substantially similar to Section 3.1 of the Performance Work Statement of the West Coast Contract. Like the West Coast Contract at issue, Section 3.1 of the Performance Work Statement for the Hampton, Va. Contract required that within ten work days after award, the awardee must submit a layout diagram that had been reviewed, signed and dated by an official of the local fire department. Additionally, Section 3.1 of the Performance Work Statement for the Hampton, Va. Contract required that every 3 million gross pounds be separated by firewalls, that the contractor have sufficient space to store up to 15 million gross pounds of personal property lots annually, and that the contractor either own or lease the storage facility for the maximum performance period of the contract, including all possible option periods.

Several questions and answers were incorporated into the Hampton, Va. Contract solicitation by amendment. Among these questions was one which asked whether a firewall separation and a completely separated area was required for each three million gross pounds of items stored. Regarding the Hampton, Va. Contract, the government responded that, depending on the type of warehouse, a separate area with access doors to allow equipment inside or a partition would be permitted, so long as the wall was from floor to roof. A second Hampton, Va. Contract question asked if it was necessary to have the entire space sufficient to store up to 15 million gross pounds available at the onset of the contract, or if proof of available sufficient space to expand to handle the maximum amount of available storage space was acceptable. The government responded, regarding the Hampton, Va. Contract, that, "[t]he Contractor must satisfy the Government's requirement of a storage facility or contiguous facilities sufficient to store up to 15,000,000 pounds of storage. Yes, the Government would accept if the Contractor could prove the facility or contiguous facilities proposed for the use under this contract could be readily expanded, when necessary, to meet the Government's required storage facility capacity of up to 15,000,000 pounds."

Six offerors, including Guardian and MVS, submitted bids for the earlier Hampton, Va. Contract. Guardian was awarded the Hampton, Va. Contract. Guardian provided a lease proposal that stated it initially would lease 134,589 square feet of warehouse space and that it had the right of first offer on the remaining contiguous 16,860 square feet of space. For the Hampton, Va. Contract,

MVS proposed the same warehouse as Guardian, but provided a lease proposal which stated the lease was not binding, and that "[o]nly a fully executed lease shall bind the parties." After notice of award, Guardian submitted a warehouse layout diagram signed and dated by a representative of the Hampton, Va. Fire Department. A preaward survey revealed that an on-site inspection found that Guardian's warehouse did not have appropriate firewall separation, as required in the Hampton, Va. Performance Work Statement. Subsequently, the firewalls were successfully installed after contract award.

SDDC received five proposals to the West Coast solicitation currently before the court for review, one proposal each from Platinum Services, Inc., Freight Hub, Inc. and Guardian, and two proposals from MVS, a primary price proposal and an alternative price proposal. The contracting officer determined that there was adequate and reliable competition pursuant to FAR 15.305(a)(1), "Cost or price evaluation." The contracting officer further determined that Guardian proposed the lowest overall price at $1,284,125.00,[2] which was [deleted]% lower than the Independent Government Cost Estimate (IGCE) of $[deleted]. The evaluated price for the proposals, including the drayage charge, in response to the initial solicitation was:

| | |
|---|---|
| Guardian | $1,291,173.75 |
| MVS alternative [3] | $[deleted] |
| MVS | $[deleted] |
| Platinum Services, Inc. | $[deleted] |
| Freight Hub, Inc. | $[deleted] |
| IGCE | $[deleted] |

Guardian submitted a non-binding Proposal to Lease for 89,600 square feet and part of a larger 179,200 square foot warehouse, which SDDC concluded could store up to 7,087,500 pounds of personal property, or up to 9,450,000 pounds, if approved by the local fire marshal. MVS' proposal included fully executed leases for two warehouses that MVS used to perform as the incumbent contractor, one of which had 104,494 square feet and a lease expiration on February 28, 2014, with a ten-year option to extend the lease; the other warehouse had 92,400 square feet, with a lease expiration on February 28, 2006, and with three five-year options to extend the lease. The contracting officer determined that Guardian had proposed the lowest price and a reasonable price compared to other offerors, the Independent Government Cost Estimate and current tendered rates on storage for non-temporary storage (NTS). The contracting officer also concluded that Guardian understood the requirements of the solicitation because Guardian was the incumbent contractor on the East Coast Contracts, and the Performance Work Statement on the West Coast Contract was not substantially different from the East Coast Contracts, and also because Guardian had proposed substantially lower rates under the previous procurements, and had consistently met the government's requirements under those East Coast Contracts.

Subsequently, the Technical Evaluation Team reviewed Guardian's technical proposal and rated Guardian acceptable, with a Pass for each of the five Technical Evaluation sub-factors. The contracting officer performed the Past Performance evaluation, stating she personally had administered Guardian's East Coast Contracts from their start dates and had maintained constant oversight throughout. She indicated that Guardian had maintained satisfactory monthly performance ratings overall under both East Coast Contracts.

The contracting officer also executed a Determination of Contractor Responsibility, noting that past performance questionnaires on Guardian had been completed by two business clients under contract with Guardian. Both rated Guardian's performance as

2. Although not a large difference, Guardian's total evaluated price was listed as $1,291,173.75 in the Abstract of Pricing and $1,284,125.00 in the Price Negotiation Memorandum. Regardless, Guardian was the low priced offeror.

3. MVS' alternative price proposal was identical to its initial primary price proposal, except that the drayage charge was different. Both of MVS' proposals identified two warehouses it intended to use for storage of SDDC's goods. However, the two warehouses were in different drayage zones, so depending on which warehouse MVS designated as the primary or secondary warehouses in each proposal, the drayage charge would be different in MVS' pricing proposals.

excellent and stated that they would recommend Guardian again for contract award. The contracting officer concluded that Guardian should receive a Low/Moderate Risk rating for the Past Performance rating. The contracting officer also concluded that Guardian met the requirement of providing evidence of the proposed lease commitment, and that Guardian would be capable of providing the necessary warehouse space facility to perform under the contract. When evaluating Guardian's past performance, the contracting officer did not consider Guardian's TOPS issues because she knew contractors (specifically, MVS and Guardian) had experienced difficulties using TOPS, and that, in Guardian's case, most of its difficulties with TOPS were the result of, or could be attributed to, conflicting advice provided by SDDC representatives and inadequate, functional TOPS training. The contracting officer commented that "problems related to [Guardian's] use of TOPS were primarily the Agency's responsibility." The contracting officer concluded that Guardian's proposal was the low-priced/technically acceptable offer, and that Guardian's past performance was acceptable.

Guardian was notified by letter on August 14, 2008 that it had been selected as the successful offeror for the West Coast Contract, for the period October 1, 2008 to September 30, 2009. Included with the award notice was a letter from the Western Regional Storage Management Office which identified items that needed to be completed by Guardian in order for the proposed facility to be approved for receipt and storage of household goods. Item (d) in the Western Regional Storage Management Office letter called for "[a] copy of the lease (if you lease your building) or deed and tax receipt (if you or the company owns your building) for the storage location which you are offering." The letter also stated that "[y]ou are advised to be extremely careful in making commitments on buildings. We recommend that leases or sales agreements include release clauses in the event SDDC cannot approve your facility. Additionally, the lease must be for a minimum of one (1) year with an option to renew for an additional two (2) years. Month to month renewals are not acceptable." Item (i) in the letter required the contractor to provide "[a] certification from the Local Fire Department or City Engineer that any fire walls separating your business from other businesses located within the building are at least a solid (continuous, unbroken) wall or partition having a fire resistance rating of not less than 1 hour. The certificate must be signed as an original."

After a debriefing by SDDC, MVS filed its first protest at the Government Accountability Office (GAO) on August 26, 2008, alleging that Guardian's price was unbalanced, unrealistically low, and that the proposal failed to conform to material requirements of the solicitation. The protest also alleged that SDDC should have found Guardian's past performance unacceptable for failure to properly use the TOPS system. In response to the protest, SDDC suspended Guardian's performance of the contract.

SDDC filed its agency report in response to plaintiff's first GAO protest, in which the contracting officer stated that she "considered many factors in determining that Guardian's price was fair and reasonable." According to the contracting officer, she "first determined that the prices proposed were based upon adequate price competition; therefore comparison of the competitive offers was sufficient to establish price reasonableness." Further, the contracting officer stated that, "since Guardian's price was significantly lower than the Independent Government Cost Estimate and the other proposals I considered additional information before making a final determination of price reasonableness." The contracting officer also responded directly to the allegation of unbalanced pricing. The contracting officer stated that she had "reviewed my previous experience with Guardian on the current East Coast NTS [non-temporary storage] contract and on other contracts. I noted that Guardian has a past history of consistently proposing no charge for high volume line items, and yet maintains satisfactory performance." The contracting officer also stated that she "was concerned about the labor rate of $[deleted] and $[deleted] proposed by Guardian, but considering that all labor provided under the contract is subject

to the approval of either the Contracting Officer or the Contracting Officer's Representative (COR), I concluded that the Government would not be at risk because the Contracting Officer or the on-site COR will closely monitor this service." The Agency requested partial dismissal of the first protest, which was denied, without comment, by the GAO on September 17, 2008.

On October 6, 2008, MVS filed its second protest at the GAO, alleging that Guardian's written commitment was not binding, that it expired 3 days after submission of proposals, and was for less space than necessary to be able store up to 15 million pounds of goods during the term of the contract, including options. In response to the second GAO protest, SDDC indicated that the proposed warehouse had a fire detection and sprinkler system and addressed the claim that Guardian had not submitted a binding warehouse lease. The Agency stated that the term "commitment," as in "commitment for sufficient warehouse space" was not defined in the solicitation. According to SDDC, the solicitation required offerors to have sufficient warehouse space available to begin performance and to provide sufficient information to the government such that the evaluators could conclude the solicitation requirements were met. According to the Agency, it would be unreasonable to require an offeror to enter into a binding lease before award, since a disappointed bidder would be liable for lease payments without income to pay for the lease. Moreover, the Agency indicated that because the contract was an IDIQ contract and the contractor was not guaranteed work beyond a minimum 5% of the maximum contract price for the base period, it was unreasonable to expect the winning offeror to have a warehouse facility capable of storing the maximum, 15 million pounds of goods at the time of contract award. The Agency indicated that based on its calculations, Guardian had proposed sufficient space to store SDDC's goods under the contract.

On December 2, 2008, an outcome prediction conference was held by GAO, during which GAO indicated that plaintiff's first and second protests likely would be denied on all grounds, except for one, MVS' claim that Guardian's warehouse space commitment was not binding. GAO proposed two corrective actions: either (1) terminate Guardian's initial West Coast Contract and evaluate the next lowest priced offeror for responsibility and technical acceptability, and if acceptable, award the contract to the next lowest priced, technically acceptable offeror, with acceptable past performance; or (2), alternatively, review the requirements under Technical Evaluation sub-factor 5, and based on a reasonable modification, amend and clarify the solicitation and solicit revised proposals from the offerors.

The GAO dismissed MVS' first and second protests on December 5, 2008, because SDDC agreed to take corrective action, which would render the protests moot. On December 9, 2008, SDDC terminated Guardian's contract for the convenience of the government, and extended the performance period of incumbent MVS' West Coast Contract. In a Memorandum of Corrective Action, dated December 11, 2008, SDDC stated it would amend the solicitation to better reflect the Agency's requirements and solicit revised proposals from all offerors. The Memorandum of Corrective Action stated, "[o]fferors will be permitted to revise any aspect of their proposals including those not the subject of the amendment. Offerors will be allowed the option of submitting new past performance information, or relying on their originally provided information." SDDC then issued Amendment 0006 to the solicitation on December 17, 2008, which altered Technical Evaluation sub-factor 5 from "[p]roof of ownership, lease or written commitment for sufficient warehouse space," to "[p]roof of ownership or lease agreement for warehouse space. If a lease agreement is proposed, it must bind the offeror upon the award if the offeror's proposal is successful." Therefore, the only contingency allowed was if the offeror did not receive the award.

On December 22, 2008, MVS filed a third protest at the GAO, which challenged the corrective action that SDDC had taken in response to the first and second GAO protests, alleging that the amendment to the solicitation did not substantially alter or clar-

ify the warehouse space binding commitment requirement. The GAO denied MVS' third protest on March 24, 2009, concluding that the corrective action taken by SDDC had addressed the impropriety identified by the GAO, and finding that there was no basis to question SDDC's remedial actions as the amendment requirement differed from the original requirement. The GAO stated Amendment 0006 made clear that an offeror must demonstrate that a lessor has committed to make a warehouse facility available and an offeror has committed to lease that facility in the event of an award of the contract, without the option of abandoning the lease, if awarded the contract. The GAO addressed MVS' concern that Amendment 0006 did not substantially alter Technical Evaluation sub-factor 5, as follows:

> With regard to the protester's argument that the agency has simply reworded the requirement without changing its meaning and given Guardian another chance to meet it, we think the amended requirement differs from the original requirement in a significant respect—it makes clear that an offeror is committing to lease the particular warehouse space in the event its proposal is selected for award. We do not think that the original solicitation language encompassed such a requirement—that is, an offeror could have satisfied the requirement for a written commitment for warehouse space by producing evidence of an option to lease that would bind the lessor if the offeror chose to exercise it, but that the offeror would not be required to exercise.

The amendment also confirmed a requirement to designate specific warehouse space for contract performance, important because the drayage rate could then be evaluated, without permitting substitution of another warehouse that, for example, had greater transportation costs associated with it. According to the GAO, the amendment would ensure that offerors' prices could be evaluated on an equal basis and the price evaluation would have meaning. On March 27, 2009, MVS filed its fourth GAO protest, asking for reconsideration of the GAO decision on the third protest, which was later dismissed when plaintiff's action was filed in this court.

Amendment 0010 to the solicitation made revised proposals due January 23, 2009. All offerors who had submitted initial proposals submitted revised proposals. Included in the proposals were technical proposals regarding warehouse space. Guardian's proposal included a facility with approximately 108,546 square feet of useable storage space in a larger facility than offered in its initial proposal on the West Coast Contract. Guardian would be the sub-tenant of the building's lessee. Guardian's sublease agreement was not dated on the first page, but included a signature page of the lessor with an effective date of January 15, 2009. The sublease agreement had a term beginning no later than April 17, 2009, to continue until January 31, 2017, with an option to renew for the period from January 31, 2017 until August 31, 2018. The renewal option was signed by Guardian and the lessee, but not by the owner (lessor). Exhibit A to Guardian's sublease stated that "Lessor retains all rights set forth in the Master Lease, including without limitation, the right to approve or disapprove any further sublease or assignment of the Premises." MVS' proposal included the same two warehouses it had included in its initial proposal, one with 104,494 square feet for an initial term from March 1, 2005 until February 28, 2014, and with an option to extend the initial term for ten years and the other warehouse with 92,400 square feet, with a lease expiration on February 28, 2006, and with three five-year options to extend the lease.

The contracting officer again determined Guardian was the lowest price offeror among the revised proposals, after performing a price analysis similar to the price analysis performed when evaluating the initial proposals. The evaluated revised price proposals were:

| | |
|---|---|
| Guardian [4] | $1,588,180.00 |

4. The contracting officer noted one pricing error in Guardian's revised proposal. Guardian had miscalculated the distance from its proposed storage facility to the Port of Oakland. The contracting officer revised the drayage rate in Guardian's revised proposal and evaluated the revised proposal with the correct drayage rate, deriving a price proposal of $1,588,180.00,

| | |
|---|---|
| MVS alternative [5] | $[deleted] |
| MVS | $[deleted] |
| Platinum Services, Inc. | $[deleted] |
| Freight Hub, Inc. | $[deleted] |
| IGCE | $[deleted] |

In evaluating Guardian's revised proposal, the contracting officer noted that Guardian's price was substantially lower than the IGCE, but that there was less than [deleted]% difference between Guardian's proposal and the alternative proposal submitted by MVS. Although Guardian's proposal included [deleted], the contracting officer stated that [deleted] and still maintaining satisfactory contract performance.

The contracting officer determined that Guardian understood the scope of work and performance required by the West Coast solicitation, in that there were no substantial revisions to the East Coast Contract Performance Work Statements, and Guardian had proposed similar rates on the East Coast Contracts and consistently had met the government's requirements under those contracts. Additionally, the Technical Evaluation Team reviewed Guardian's technical proposal and rated it a Pass for each of the five sub-factors of the Technical Evaluation factor. Guardian did not submit a revised past performance proposal, so the Past Performance Evaluation from its initial proposal remained the same, and Guardian again was assigned a rating of Pass for the Past Performance factor.

SDDC awarded the Second West Coast Contract to Guardian on March 27, 2009 and notified MVS that it had not received the award. On April 9, 2009, MVS filed a fifth protest at the GAO, challenging SDDC's second award to Guardian and alleging that SDDC had evaluated Guardian's proposal improperly as having acceptable past performance on Guardian's Hampton, Va. Contract, SDDC failed to perform a required price realism analysis for Guardian's offer, Guardian's unreasonably low priced offer contained unbalanced pricing, and Guardian's proposed warehouse did not have sufficient space to meet the requirements of the solicitation. In response, SDDC suspended Guardian's performance of the Second West Coast Contract and again extended incumbent MVS' performance of the West Coast Contract, pending resolution of the fifth protest. SDDC filed a request for dismissal of the fifth protest at the GAO, stating the protest was based on unsupported speculation and not fact. On April 29, 2009, the GAO dismissed the fifth protest on the grounds that MVS failed to state a legally sufficient basis of protest, but indicated that because the Agency had not yet furnished MVS with sufficient information, once MVS had more information, it could renew its GAO protest. After the dismissal of MVS' fifth protest by GAO, SDDC lifted the suspension on performance of Guardian's Second West Coast Contract and Guardian began performance.

On May 18, 2009, MVS filed a sixth protest at the GAO, alleging that SDDC had improperly evaluated Guardian's past performance because SDDC knew Guardian had failed to comply with material requirements of the Hampton, Va. Contract, particularly with respect to firewalls. In response, SDDC requested the GAO to dismiss the sixth protest, because the protest was based on unsupported allegations regarding Guardian's past performance on the Hampton, Va. Contract. SDDC also filed an agency report stating that a local fire official had reviewed and approved Guardian's warehouse diagram showing the locations of firewalls, as required by the contract. On June 19, 2009, MVS filed a seventh protest at the GAO, alleging Guardian's technical proposal did not meet the requirements of three of the Technical Evaluation sub-factors, verification of flood plain location, a fire system maintenance contract, and proof of ownership or lease agreement, because Guardian had not begun negotiations for a warehouse until approximately three weeks prior to the filing of the seventh protest. MVS subsequently filed

which was used for evaluation purposes by SDDC.

5. As with the initial evaluated price proposals, both of MVS' revised price proposals identified two warehouses MVS intended to use for storage of SDDC's goods. However, the two warehouses were in different drayage zones, so depending on which warehouse MVS designated as the primary or secondary warehouses in each proposal, the drayage charge would be different in MVS' pricing proposals.

the complaint in the United States Court of Federal Claims, following which, the GAO dismissed MVS' pending fourth, sixth and seventh protests because MVS informed the GAO it had filed a protest in this court. Cross-motions for judgment on the administrative record were filed by all parties, and oral argument was held.

## DISCUSSION

*Standard of Review*

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2006)), amended the Tucker Act, providing the United States Court of Federal Claims with a statutory basis for bid protests. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1330–32 (Fed. Cir.2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. *See, e.g., Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.) (citing *Scanwell* for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), *reh'g denied* (Fed.Cir.2004); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004) ("Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.' " (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332)); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2003).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2006);[6] *see also Savantage Fin. Servs. Inc. v. United States,* 595 F.3d 1282, 1285–86 (Fed.Cir.2010); *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1358 (Fed.Cir.2009); *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1381 (Fed. Cir.2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1312 (Fed.Cir.2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " (quoting 5 U.S.C. § 706(2)(A) (2000))); *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *See Impresa Construzioni Geom.*

6. The full language of section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Domenico Garufi v. United States, 238 F.3d at 1332 n. 5; *see also NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.), *reh'g denied* (Fed.Cir.2000))); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

In *Garufi,* the United States Court of Appeals for the Federal Circuit wrote:

> Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1)[T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.*, and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [ (D.C.Cir.1973) ]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Banknote Corp. of Am. v. United States,* 365 F.3d at 1351; *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Textron, Inc. v. United States,* 74 Fed.Cl. 277, 285 (2006), *appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc.,* 222 Fed.Appx. 996 (Fed.Cir.), 223 Fed.Appx. 974 (Fed.Cir.2007); *Labat-Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2001); *Dynacs Eng'g Co. v. United States,* 48 Fed. Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal dismissed,* 6 Fed.Appx. 867 (Fed.Cir. 2001).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also In re Sang Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision.... The reviewing court is thus enabled to perform a meaningful review ...."), *aff'd on subsequent appeal,* 262 Fed.Appx. 275 (Fed.Cir.2008); *Textron, Inc. v. United States,* 74 Fed.Cl. at 285–86. Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); *see also R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1322 (Fed.Cir.2003) (citing *Ray v. Lehman,* 55 F.3d 606, 608 (Fed.Cir.)) *cert. denied* 516 U.S. 916, 116 S.Ct. 304, 133 L.Ed.2d 209 (1995). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523 (2003) (quoting *Honeywell, Inc. v. United States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301)).

As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 6–7, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1341, 43 L.Ed.2d 433 (1975); *Co–Steel Raritan, Inc. v. ITC,* 357 F.3d 1294, 1309 (Fed.Cir.2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *In re Sang Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438)); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993); *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 63 (2001), *aff'd,* 30 Fed.Appx. 995 (Fed.Cir. 2002); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal repre-

sents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed.Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3, 1994 WL 129008, at *2 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

* * *

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.")....

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also Galen Med. Assocs., Inc. v. United States,* 74 Fed.Cl. 377, 383-84 (2006); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002).

In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am. Inc. v. United States,* 365 F.3d at 1355 (citing *TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327-28 (Fed.Cir.1996); *E.W. Bliss Co. v. United States,* 77 F.3d at 449; and *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 958-59); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *Am. Tel. and Tel. Co. v. United States,* 307 F.3d 1374, 1379 (Fed.Cir.2002), *reh'g en banc denied* (Fed.Cir.), *cert. denied,* 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 958; *Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement ...." (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339-40, 548 F.2d 915 (1977))). In *Burroughs Corporation v. United States,* the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation, the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

*Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir.1995); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. at 388; *ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); *Sperry Flight Sys. Div. v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States,* 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 819 (1989), *aff'd,* 914 F.2d 271, 1990 WL 122139 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.,* 573 F.2d at 73, 216 Ct.Cl. 69....

*Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d at 958–59; *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d at 995; *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d at 1046; *PHT Supply Corp. v. United States,* 71 Fed.Cl. 1, 11 (2006).

Barring arbitrary and capricious behavior or a violation of law, the wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. *See Compubahn, Inc. v. United States,* 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted); *see also Textron, Inc. v. United States,* 74 Fed.Cl. at 286 (in which the court considered technical ranking decisions "minutiae of the procurement process" not to be second guessed by a court) (quoting *E.W. Bliss Co. v. United States,* 77 F.3d at 449). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.

To prevail in a bid protest case, the protester not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First ... the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second ... if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

*Bannum, Inc. v. United States,* 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error,

"'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.'") (citation omitted).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (Fed.Cir.1999) (citation omitted in original); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331; *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed. Cir.2002); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33; *OMV Med., Inc. v. United States,* 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000).

In *Data General Corporation v. Johnson,* the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of *CACI, Inc.-Fed.,* 719 F.2d at 1574.

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.1996); *see also Bannum, Inc. v. United States,* 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum.... To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367; *Statistica, Inc. v. Christopher,* 102 F.3d at 1581; and *Data Gen. Corp. v. Johnson,* 78 F.3d at 1562)); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'") (quoting *Statistica, Inc. v. Christopher,* 102 F.3d at 1582); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d at 1370 (using the "substantial chance" standard); *OMV Med., Inc. v. United States,* 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057 (using a "reasonable likelihood" rule); *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d at 1380 (using a "substantial chance" test); *Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 96 (2006) (using a "substantial chance" test), *recons. in part,* 75 Fed.Cl. 406, 412 (2007) (using a "substantial chance" test); *Park Tower Mgmt., Ltd. v. United States,* 67 Fed. Cl. 548, 559 (2005) (using a "substantial chance" test).

Plaintiff's complaint brings three counts before this court. In Count I, the plaintiff alleges SDDC did not evaluate Guardian's initial proposal or revised proposal in accordance with the evaluation criteria in the RFP. Plaintiff asserts that Guardian submitted unacceptable price and technical proposals and that Guardian should not have received a Pass rating on past performance. In Count II, the plaintiff alleges that SDDC acted arbitrarily and capriciously in taking corrective action that allowed Guardian another opportunity to submit revised information regarding its commitment for warehouse space. In Count III, plaintiff alleges that by acting arbitrarily and capriciously, SDDC breached its implied-in-fact contract to treat MVS' proposals fairly and honestly by awarding the contract to Guardian twice.[7]

7. Count III of the plaintiff's complaint is titled, "Breach of Implied-in-Fact Contract to Give MVS' Proposal Fair and Honest Consideration or Violations of 5 U.S.C. § 706." The body of

The plaintiff requests a number of forms of relief, first asking for a declaration that Guardian submitted an unacceptable proposal and was, therefore, ineligible for the Initial West Coast Contract, and a declaration that SDDC's failure to eliminate Guardian from competition was arbitrary and capricious and without any rational basis. Alternatively, plaintiff requests a declaration that if Guardian is not declared ineligible to compete after submission of its first proposal, SDDC's corrective action, which allowed Guardian to submit a revised proposal be declared arbitrary and capricious and without rational basis and in violation of applicable law. Alternatively, the plaintiff seeks a declaration that Guardian submitted an unacceptable, revised proposal and, therefore, was ineligible for the Second West Coast Contract, and that SDDC's failure to eliminate Guardian from competition was in violation of applicable law, arbitrary and capricious and without rational basis. The plaintiff asks for a permanent injunction, termination of the Second West Coast Contract and that performance under Guardian's Second West Coast Contract be enjoined. Plaintiff also requests that Guardian be excluded from the competition, and that SDDC award a contract based on the remaining original proposals to the low priced, technically acceptable offeror, with acceptable past performance. Plaintiff also asks for an award of its bid and proposal costs, absent injunctive relief.

*Mootness*

Defendant and intervenor argue that plaintiff's allegations regarding alleged improper actions regarding the first award to Guardian are moot, "because SDDC cancelled the initial award on December 9, 2008 and amended the solicitation on December 17, 2008." Plaintiff, however, responds that the corrective action taken by SDDC would render moot plaintiff's challenge to the first award to Guardian only "if the corrective action had actually addressed the improprieties in the procurement, which it did not." According to plaintiff, the Agency's corrective action "failed to correct the improprieties raised by MVS and acknowledged by GAO, and instead simply served the purpose of allowing [Guardian] to revise its proposal so it was acceptable."

As discussed above, after protest activity at the GAO, on December 9, 2008, SDDC terminated the earlier award to Guardian for the convenience of the government and extended performance of plaintiff's West Coast Contract. After issuing a Memorandum of Corrective Action, the Agency amended the solicitation and sought revised proposals from all offerors, including Guardian and MVS. In Count II of its complaint in this court, the plaintiff alleges that by permitting Guardian another opportunity to submit a revised proposal with a binding commitment for warehouse space, instead of eliminating Guardian from bidding on the solicitation, SDDC treated offerors unfairly, acted arbitrarily and capriciously, and violated the FAR, including FAR 15.306(e)(1). FAR 15.306(e)(1) states: "Government personnel

Count III states that: "The Agency breached its implied-in-fact contract to treat MVS' proposals fairly and honestly," and asks for bid and proposal costs if injunctive relief is not provided. The United States Court of Appeals for the Federal Circuit recently clarified this area of the law in *Resource Conservation Group, LLC v. United States,* 597 F.3d 1238 (Fed.Cir.2010).

The Federal Circuit stated,

> we conclude that implied-in-fact contract jurisdiction does survive as to claims where the new statute [codified at 28 U.S.C. § 1491(b)] does not provide a remedy.... We agree that Congress intended the 1491(b)(1) jurisdiction to be exclusive where 1491(b)(1) provided a remedy (in procurement cases).... Congress did not intend to alter or restrict the Court of Federal Claims' existing jurisdiction in cases not covered by the new statute.... We conclude that the court's implied-in-fact jurisdiction over nonprocurement solicitations survived the enactment of 1491(b)(1).

*Id.* at 1245–46; *see also Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1330–33, 1332 n. 6 and *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132–33, 1132 n. 5 (Fed.Cir.1998), for history and background on this issue. The present case involves a bid protest of a procurement. Therefore, under the Federal Circuit's decision in *Resource Conservation,* the United States Court of Federal Claims' bid protest statute provides exclusive jurisdiction in this court, 28 U.S.C. § 1491(b)(1), and exclusive remedies, including injunctive relief and bid and proposal costs, 28 U.S.C. § 1491(b)(2). Under these circumstances, the implied-in-fact contract theory of Count III of the complaint is not operative, and will not be further addressed in this opinion.

involved in the acquisition shall not engage in conduct that—(1) Favors one offeror over another[.]" 48 C.F.R. § 15.306(e) (2009). The defendant responds that SDDC's actions may be set aside only "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Defendant also asserts that, in evaluating whether an agency official's actions were rational, the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994))).

In the initial solicitation, Technical Evaluation sub-factor 5 required "[p]roof of ownership, lease or written commitment for sufficient warehouse space." Guardian's initial proposal included a Proposal to Lease 89,600 square feet of a larger 179,000 square foot warehouse, "subject to both parties executing a Lease Agreement in form and substance satisfactory to each party." The Technical Evaluation Team evaluated Guardian's technical proposal and rated it acceptable, with a Pass for all five Technical Evaluation sub-factors. In addition to being technically acceptable, Guardian was the low priced offeror, with acceptable past performance. After the contracting officer performed a Determination of Contractor Responsibility, Guardian was awarded the Initial West Coast Contract.

In response to SDDC awarding Guardian the Initial West Coast Contract, MVS filed its first two protests at the GAO. Among other allegations, plaintiff's second protest asserted that Guardian's written commitment for warehouse space was not binding and, therefore, SDDC had improperly awarded the Initial West Coast Contract to Guardian. In its outcome prediction, GAO indicated that MVS' protests would likely be denied on all grounds except one, that Guardian's proposal did not meet the requirements of Technical Evaluation sub-factor 5 because of the non-binding, conditional nature of the proposal. As discussed above, the GAO identified two potential corrective actions. When SDDC informed the GAO that it would take corrective action, the GAO dismissed MVS' protests.

After terminating Guardian's Initial West Coast Contract, SDDC issued a Memorandum of Corrective Action which stated that the solicitation language "should be amended to clarify the standard for acceptability of Subfactor 5. The RFP should explain that in order to be rated 'acceptable' the proposal must evidence the binding nature of the business arrangement for the warehouse proposed. The only allowable lease contingency would be award of the contract. That is, the warehouse lease must be binding upon award of the contract." The Memorandum of Corrective Action also stated that, "[a]ll offerors will then be requested to submit revised proposals. Offerors will be permitted to revise any aspect of their proposals including those not subject of the amendment. Offerors will be allowed the option of submitting new past performance information, or relying on their originally provided information." Amendment 0006 to the solicitation changed the language of Technical Evaluation sub-factor 5 from "[p]roof of ownership, lease or written commitment for sufficient warehouse space" to "[p]roof of ownership or lease agreement for warehouse space. If a lease agreement is proposed, it must bind the offeror upon the award if the offeror's proposal is successful." The only allowable lease contingency would be failure to receive award of the contract.

After SDDC issued the Memorandum of Corrective Action and amended the solicitation, MVS filed its third protest at the GAO, claiming that Amendment 0006 "did not substantively alter or clarify the requirements of the RFP with respect to the material solicitation requirement that Guardian failed to meet. Instead, the Agency retained the requirement for a binding space commitment, but then sought revised proposals, thus, giving Guardian a second opportunity to submit a binding commitment...." SDDC filed an agency report in response and stated that Amendment 0006 "confirmed SDDC's requirement for offerors to designate the exact warehouse space they would use to perform the contract, but also recognized the com-

mercial impracticability of requiring all offerors to propose binding leases when only one offeror will receive the contract award."

The GAO denied MVS' third protest, concluding that "[t]he corrective action taken by the agency—amending the RFP to clarify what constitutes an acceptable commitment for warehouse space, allowing offerors to submit revised proposals and reevaluating—addresses that impropriety [identified by the GAO in the outcome prediction]. Accordingly, we have no basis to question the agency's action."

The GAO wrote:

> With regard to the protester's argument that the agency has simply reworded the requirement without changing its meaning and given Guardian another chance to meet it, we think that the amended requirement differs from the original requirement in a significant respect—it makes clear that an offeror needs to demonstrate not simply that a lessor is committing to make warehouse space available if it receives the award, but also that the offeror is committing to lease the particular warehouse space in the event its proposal is selected for award. We do not think that the original solicitation language encompassed such a requirement—that is, an offeror could have satisfied the requirement for a written commitment for warehouse space by producing evidence of an option to lease that would bind the lessor if the offeror chose to exercise it, but that the offeror would not be required to exercise. The change reflected in the amendment is significant because, as noted above, the cost of transporting the goods from the port to the warehouse is to be considered in the evaluation of pricing. Without a binding commitment to use the warehouse on which its price evaluation is based, an offeror could substitute another warehouse with materially different transportation costs. Thus, by requiring offerors to demonstrate in their proposals that they had entered into an agreement for warehouse space that would be binding on both the lessor and the offeror in the event the offeror received contract award, the amendment ensures that offerors' prices will be evaluated on an equal basis and that the price evaluation will be meaningful.

SDDC made all revised proposals due by January 23, 2009. All offerors who had submitted an initial proposal also submitted a revised proposal. After determining that Guardian again was the low priced, technically acceptable offeror, with acceptable past performance, SDDC for the second time awarded the West Coast Contract to Guardian.

The government has the authority to amend or cancel a solicitation, "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions...." 48 C.F.R. § 15.206(a) (2009); *see also Savantage Fin. Servs. Inc. v. United States,* 86 Fed.Cl. 700, 707 (2009), *aff'd,* 595 F.3d 1282 (Fed.Cir. 2010); 48 C.F.R. § 15.206, "Amending the Solicitation." Moreover, it was appropriate for SDDC to follow GAO guidance, and either terminate the initial award to Guardian and reevaluate the remaining offers, or amend the solicitation. *See Honeywell, Inc. v. United States,* 870 F.2d at 648 (" 'It would be entirely justifiable for the contracting officer to follow the general policy of acceding to the views of the Accounting Office ....' " (quoting *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 390, 325 F.2d 438, 442 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964))). Even though SDDC may have disagreed with the GAO's proposed options, it was proper and common practice for SDDC to follow the recommendation of the GAO, by amending the solicitation and soliciting revised proposals. *See Centech Group, Inc. v. United States,* 554 F.3d at 1039. While opinions and guidance of the GAO are not binding or determinative in this court, "the Court recognizes GAO's longstanding expertise in the bid protest area and accords its decisions due regard." *Integrated Bus. Solutions, Inc. v. United States,* 58 Fed.Cl. 420, 427 n. 7 (2003). If after examination of the record, the decision to amend the solicitation and resolicit was reasonable, the court should not substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856.

Although an amendment should "not be used as a vehicle to steer a contract toward or away from a particular contractor, [t]hese fairness concerns are neither implicated nor offended to the extent such an amendment is designed, instead, merely to ensure that the United States receives the best possible value at the lowest cost—indeed, such is the essence of a best value procurement." *ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 75. SDDC acted by following one of two options offered by the GAO, and acted to reflect the Agency's requirements by not requiring all warehouse space commitments to be in place at the time of proposal, but rather allowing ownership, a binding lease or a lease which would be automatically become effective only in the event of an award. The amendment, however did not include an as needed provision, which would allow offerors to propose some storage space by the solicitation closing date and increase available space as needed.

It would seem that if SDDC truly had wanted to steer the contract to Guardian it would have permitted the revised proposals only to address Technical Evaluation subfactor 5. Indeed, as Guardian's initial proposed price had been shared with Platinum Services in their unsuccessful offeror letter and with MVS at a debriefing, the contracting officer noted that, "[b]ecause their original proposed price is now public, I recognized that Guardian may be at somewhat of a competitive disadvantage when preparing a revised proposal." In spite of the potential disadvantage to Guardian, the contracting officer concluded:

> Nonetheless, in light of the significant time [almost six months] that has passed since original proposals were due, and in view of the changing economy, I cannot conclude that limiting proposal revisions to clarification of the warehouse business arrangements is a reasonable or fair decision. It is likely that pricing will be affected as a result of possible new warehouse business arrangements and a differing economic climate. Permitting complete proposal revisions, to include revised pricing, seems to be the most fair way to ensure a reasonably equal competition, despite the fact that Guardian's prices were properly released after award.

By following one of the corrective actions suggested by GAO and offering an opportunity to all offerors to submit revised proposals in response to any portion of the amended solicitation, "including those not the subject of the amendment," SDDC provided itself with an opportunity to receive the best realistic value at the lowest cost, almost six months after the initial proposals were due. In the time since the original award to Guardian, it was not clear that the original price proposals remained realistic. SDDC's decision to issue the amendment to the solicitation and to request revised proposals was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Blue & Gold Fleet, L.P. v. United States,* 492 F.3d at 1312; *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332. Moreover, the amendment reflected reasonable changes to the earlier requirements.

"Mootness is a jurisdictional question...." *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *see also CW Gov't Travel, Inc. v. United States,* 46 Fed.Cl. 554, 556 (2000). "While Congress created this court under Article I of the U.S. Constitution and the 'case or controversy' requirement appears in Article III, the mootness doctrine and other justiciability precepts—including ripeness and standing—have often been properly invoked by this court," *Emery Worldwide Airlines, Inc. v. United States,* 47 Fed.Cl. 461, 469 (2000), and are applicable in this court. As stated by the United States Court of Appeals for the Federal Circuit:

> The Court has explained that a case becomes moot when it has "lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). Thus, to avoid dismissal for mootness, an actual controversy must remain at all stages, not mere-

ly at the time the complaint is filed. *E.g., Steffel v. Thompson,* 415 U.S. 452, 460 n. 10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). *Gerdau Ameristeel Corp. v. United States,* 519 F.3d 1336, 1340 (Fed.Cir.2008).

Defendant relies on the United States Supreme Court decision in *County of Los Angeles v. Davis,* for the proposition that " 'a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). A case becomes moot if "it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur," and that (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). The intervenor cites *Galen Medical Associates, Inc. v. United States* for the proposition that claims to an initial solicitation are moot when an award is cancelled and the solicitation is amended. *See Galen Med. Assoc., Inc. v. United States,* 369 F.3d at 1333 ("The Court of Federal Claims concluded that Galen's complaints regarding the initial solicitation were rendered moot when the VA [G.V. Sonny Montgomery Veterans Affairs Medical Center] vacated the award and agreed to amend the solicitation. We agree that the complaints based on pre-corrective action events are moot where charged as a specific violation of a code or statute, but are relevant in order to establish a possible pattern of bias.").

In contrast, plaintiff cites to *Chapman Law Firm Co. v. Greenleaf Construction Co.,* for support that its protest in this court of the initial award to Guardian is not moot, simply because the solicitation was amended. Plaintiff relies on the following language from *Chapman:* "the Government's argument that its first proposed corrective action rendered all of Chapman's and Greenleaf's claims moot or premature is also incorrect as the corrective action effectively left out Greenleaf." *Chapman Law Firm Co. v. Greenleaf Constr. Co.,* 490 F.3d 934, 938 (Fed.Cir.2007). However, the United States Court of Appeals for the Federal Circuit concluded in *Chapman:*

> that the Court of Federal Claims had already determined that the revised corrective action was reasonable, and was required to assume that the Government would carry out the corrective action in good faith.... The revised corrective action adequately addressed the effects of the challenged action, and the Court of Federal Claims had no reasonable expectation that the action would recur. Accordingly, the Court of Federal Claims should have dismissed the case.

*Id.* at 940.

The plaintiff's reliance on *Chapman Law Firm Co. v. Greenleaf Construction Co.* is misplaced. In *Chapman,* after a contract award, the United States Department of Housing and Urban Development decided voluntarily to implement corrective action. The corrective action taken by the government, however, did not include one of the disappointed bidders in the small business tiers, despite a determination by the Small Business Administration that the disappointed bidder was, in fact, a small business. That corrective action, therefore, was determined by the trial court to be lacking a rational basis. *Id.* at 937. In the case before this court, however, corrective action taken by SDDC in clarifying the warehouse commitment requirement, as proposed by the GAO, was proper and reasonable. Amendment 0006 specifically stated that any offeror who previously had responded may "submit revised proposals based on the changes outlined in this amendment. Offeror's [sic] can submit a revised proposal on any area of the solicitation or the offeror can choose to rely on its original proposal...." Unlike in *Chapman,* the corrective action included all offerors in its invitation to submit revised proposals, and there was no reasonable expectation that the violation would recur.

In the present case, the GAO found the corrective action appropriate and this court finds the government action to allow

revised proposals was not arbitrary, capricious or an abuse of discretion under the stringent precedential standards. Curing the identified problem and allowing all competitors to revise their submissions eradicates the negative effects of the alleged violation under the initial solicitation. Once the award to Guardian was cancelled, the solicitation was amended and revised proposals were reviewed under the amended solicitation, the solicitation in its original form ceased to exist.

Under the test in *County of Los Angeles v. Davis,* a case is moot if "(1) it can be said with assurance that [there is] no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. at 631, 99 S.Ct. 1379 (internal quotations and citations omitted). The corrective action taken by SDDC to solicit revised proposals and to evaluate the revised proposals received meets both requirements identified by the Court in *Davis.* Amendment 0006 satisfied the first prong of the *Davis* test, because after the amendment was issued, SDDC would be able to calculate drayage costs accurately, a defect which the GAO had noted SDDC could not do effectively if the proposed leases were not binding on the offerors, because the drayage rates were part of the pricing evaluation. According to the GAO, "[w]ithout a binding commitment to use the warehouse on which its price evaluation is based, an offeror could substitute another warehouse with materially different transportation costs. Thus ... the amendment ensures that offerors' prices will be evaluated on an equal basis and the price evaluation will be meaningful." Further, as the GAO noted, Amendment 0006 "makes clear that an offeror needs to demonstrate not simply that a lessor is committing to make warehouse space available if it receives the award, but also that the offeror is committing to lease the particular warehouse space in the event its proposal is selected for award." Thus, Amendment 0006 not only allowed for SDDC to calculate drayage costs accurately, but by clarifying the commitment requirement also allowed only binding commitments to be submitted as part of the technical proposal. Additionally, by permitting all offerors to submit revised proposals, the second prong of the *Davis* test is satisfied. The interim events of amending the solicitation and allowing all offerors to submit revised proposals eradicated the effects of the violation alleged, and the revised proposals were evaluated anew. After consideration of the record, the court concludes that to the extent that plaintiff's complaint and motion for judgment on the administrative record seek injunctive remedies based on the initial award to Guardian, the claims are denied as moot.

*Past Performance*

The plaintiff asserts that "SDDC should have found Guardian's offers unacceptable under the past performance evaluation factor," and that SDDC acted without a rational basis when it determined that Guardian's past performance qualified for a Pass under the solicitation's Past Performance Evaluation factor. Specifically, the plaintiff claims that Guardian's improper use of the TOPS, Guardian's excessive amount of coopering and violations of fire safety requirements should have resulted in an unacceptable Past Performance Evaluation rating of Fail. The defendant and the intervenor argue that the evaluation of Guardian's past performance was reasonable. The defendant also asserts that to prevail, the plaintiff must show "by a preponderance of the evidence, that Guardian's past performance record should have given the Agency 'extreme doubt' that Guardian would successfully perform the West Coast contract."

As a Judge of this court recently explained, "[i]n the bid protest context, the assignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'" *Todd Constr., L.P. v. United States,* 88 Fed.Cl. 235, 247 (2009) (quoting *Clean Venture, Inc.,* B–284176, 2000 CPD ¶ 47, 2000 WL 253581, at *3 (Comp.Gen. Mar.6, 2000)); *see also Al Andalus Gen.*

*Contracts Co. v. United States,* 86 Fed.Cl. 252, 264 (2009) ("It is well-recognized that an agency's evaluation of past performance is entitled to great deference."); *SP Sys., Inc. v. United States,* 86 Fed.Cl. 1, 23 (2009) ("[P]ast performance evaluation 'will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.' " (quoting *Consolidated Eng'g Servs., Inc. v. United States,* 64 Fed.Cl. 617, 637 (2005))); *Westech Int'l, Inc. v. United States,* 79 Fed.Cl. 272, 293 (2007) ("When the court considers a bid protest challenge to the past performance evaluation conducted by the agency, 'the greatest deference possible is given to the agency.' " (quoting *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004))); *Overstreet Elec. Co., Inc. v. United States,* 59 Fed.Cl. 99, 117 (2003) ("And when a procurement involves performance standards, which is what this court also faces, a court must grant *even more* deference to the evaluator's decision." (citing *E.W. Bliss Co. v. United States,* 77 F.3d at 449)) (emphasis in original).

After issuing the corrective action, following the protest activity at the GAO, SDDC permitted all offerors to submit revised proposals. The contracting officer stated that, "[o]fferors will be permitted to revise any aspect of their proposals including those not the subject of the amendment. Offerors will be allowed the option of submitting new past performance information, or relying on their originally provided information." When Guardian submitted its revised proposal, Guardian elected not to submit revised past performance information. Guardian, therefore, was assigned a rating of Pass as "the initial evaluation performed by the Contracting Officer ... remains the same."

The solicitation stated:

> This is a low priced technically acceptable Request for Proposal with a Past Performance Evaluation. An award will be made to the responsible low priced technically acceptable offeror with acceptable past performance. In the event that the low priced offeror is technically acceptable and has an acceptable past performance rating, award shall be made to that offeror. No other proposals will be considered for award at this point and the evaluation process will end.

Respecting past performance, the solicitation included the following language: "The Government will conduct a performance risk assessment based upon the quality of the offeror's past performance as well as that of its proposed subcontractors, as it relates to the probability of successful accomplishment of the required effort." The solicitation also indicated that, "[t]he assessment of performance risk is not intended to be the product of a mechanical or mathematical analysis of an offeror's performance on a list of contracts, but rather the product of subjective judgment of the evaluation team after it considers all available information." Past performance was evaluated on a pass/fail basis. As noted above, definitions of pass/fail/neutral in the solicitation were:

> PASS (Low/Moderate Risk)—Based on offeror's past performance record, little or no doubt exists that the offeror will successfully perform the required work.
>
> FAIL (High Risk)—Based on offeror's past performance record, extreme doubt exists that the offeror will successfully perform the required effort.
>
> NEUTRAL (Unknown Risk)—No relevant performance record is identified upon which to base a meaningful performance risk prediction. A search was unable to identify any relevant past performance information for the offeror. This is neither a negative or positive assessment.

Two of Guardian's past performance questionnaires were included in the administrative record. The questionnaires were submitted with Guardian's proposal to the initial solicitation, and were submitted, unrevised, when plaintiff responded to the amended solicitation. Both questionnaires gave Guardian Excellent ratings for all evaluation factors, and stated that the evaluators would award a contract to Guardian again if given the opportunity. Additionally, the administrative record includes monthly appraisals on Guardian's Hampton, Va. Contract, from October 2007 through May 2009, for which Guardian received a satisfactory rating each month. Each monthly appraisal stated:

"Guardian's performance in the receiving, handling and storage of non-temporary storage of household goods was deemed satisfactory." The monthly appraisals also included the amount of coopering performed by Guardian under the Hampton, Va. Contract.

The contracting officer, who also was the contracting officer for Guardian's Hampton, Va. Contract, oversaw the installation of firewalls at Guardian's facility in Hampton, Va. The contracting officer monitored the installation and inspection of three firewalls via correspondence with Guardian and the contracting officer's representative. The contracting officer received confirmation from Guardian that Guardian had installed its first firewall in the Hampton, Va. warehouse in the spring of 2008. Through subsequent communications with the contracting officer's representative and Guardian, the contracting officer learned that Guardian had completed installation of its second firewall by December 31, 2008 and that Guardian had completed its third firewall in April 2009.

The contracting officer performed the Past Performance evaluation for the West Coast Contract and gave Guardian a Pass (Low/Moderate Risk). The contracting officer noted: "I personally have administered these contracts [East Coast Contracts] [8] from their start dates and have maintained constant oversight throughout." The contracting officer concluded that "Guardian has maintained satisfactory monthly performance ratings overall under both contracts." In the Contracting Officer's Statement of Facts submitted in an earlier GAO protest, the contracting officer explained her rationale for evaluating Guardian's past performance as a Pass.

> In addition to the two references [past performance questionnaires] provided by Guardian, I considered my own experience as the Contracting Officer for the East Coast contract [sic] the Agency has with Guardian. Both references gave Guardian exceptional evaluations and described only strengths for the company. I receive monthly evaluations from the on-site COR [contracting officer representative] who monitors Guardian's performance of the East Coast contract [sic] on a daily basis. Through these monthly evaluations and my personal experience, I determined that Guardian has consistently met the Government's requirements under three separate NTS [non-temporary storage] contracts.

Guardian's East Coast Contracts required the use of TOPS. The contracting officer acknowledged that Guardian had demonstrated difficulties in using TOPS. The plaintiff contends that because Guardian repeatedly, and improperly, failed to select the lowest-cost freight transportation service provider, as required under TOPS, a rating of Fail for Past Performance should have been assigned to Guardian. Nevertheless, the contracting officer concluded that Guardian's past performance should receive a Pass rating. The contracting officer stated:

> In evaluating Guardian's past performance I did not consider past TOPS issues since I was aware that both NTS [non-temporary storage] contractors (MVS and Guardian) have had difficulty using the Government automated system (TOPS) to choose carriers to transport HHG/UB [household goods and unaccompanied baggage] handled-out by the NTS [non-temporary storage] contractor.... I was aware that, in Guardian's case, most of their difficulties could be attributed to conflicting guidance provided by SDDC representatives (TOPS Help Desk, Personal Property Office) to Guardian to resolve TOPS issues and inadequate functional TOPS training.

The contracting officer concluded that "problems related to the contractor's use of TOPS

8. Although in the Past Performance evaluation the contracting officer referred to "two SDDC NTS contracts: DAMT01–02–D–0021 and W81GYE–07–D–0021," as the contracts she had personally administered, it is likely that the contracting officer incorrectly wrote "DAMT01–02–D–0021" instead of DAMT01–02–D–0030, which is the contract reference number for the Baltimore, Md. Contract. In the contracting officer's Statement of Facts submitted in response to one of MVS' GAO protests, the contracting officer, in referring to Guardian's past performance, stated "Guardian listed two current SDDC contracts for NTS storage: (1) W81GYE–07–D–0021; and (2) DAMT01–02–D–0030, both of which I administer." Additionally, the Joint Stipulation of Facts states that the contracting officer "served as the contracting officer for the East Coast Contracts."

were primarily the Agency's responsibility." The contracting officer also indicated:

> In evaluating Guardian's past performance I determined that none of the problems related to Guardian's use of the TOPS system ... was Guardian's fault and that Guardian has complied with all the guidance and direction that SDDC has provided in an effort to resolve any issues that had arisen.... Based on the Past performance evaluations that I received and on my own experience with Guardian's performance of the previous contracts and its use of the TOPS system, I concluded that Guardian's past performance rating is PASS.

Given the deference afforded to an agency's ratings on past performance, this court finds that the contracting officer's explanation for awarding Guardian a Pass rating, despite Guardian's issues with TOPS, was reasonable. Similarly, it was reasonable for the contracting officer not to rate Guardian's past performance with a Fail rating simply because of the issues with TOPS, given the Agency's own difficulties regarding TOPS, and given that other contractors were similarly affected.

The plaintiff also contends that the amount of coopering, or repair of the crates used to store and transport the household goods, performed by Guardian under the Hampton, Va. Contract was excessive, and that Guardian "abused the coopering SubCLIN." However, the monthly appraisals of Guardian's coopering activities performed by the contracting officer or the contracting officer's representative deemed Guardian's performance to be satisfactory. Given these satisfactory appraisals of Guardian's monthly performance, and the level of deference the court should afford to an agency regarding past performance evaluations, the court finds insufficient evidence in the record to warrant a finding that Guardian abused the coopering sub-contracting line item number (SubCLIN) under the Hampton, Va. Contract, or that Guardian's past performance evaluation of Pass reflected arbitrary or capricious action or an abuse of discretion by the Agency.

The plaintiff further claims it was unreasonable to rate Guardian's past performance with a Pass rating because of violations of fire safety requirements on the Hampton, Va. Contract, including the failure to submit a proper layout diagram of Guardian's storage facility and the failure to build the requisite number of firewalls on time. However, the approved diagram in the record indicates that representatives of the Hampton, Virginia Fire Department reviewed and approved Guardian's warehouse layout diagram, as required by the Performance Work Statement to the Hampton, Va. Contract. The Hampton, Va. Contract's Performance Work Statement also required that, "the storage facility shall provide firewall separation for every three (3) million gross pounds of stored personal property lots...." Guardian was required to submit monthly reports to the contracting officer of the total weight of the household goods and unaccompanied baggage stored, to assist the contracting officer to determine when firewalls would need to be constructed to meet the requirements of the Hampton, Va. Performance Work Statement.

The contracting officer oversaw the installation of three firewalls at the Hampton, Va. storage facility. The contracting officer frequently exchanged emails with Guardian's representatives and the contracting officer's representative regarding the progress of the firewalls. In May 2008, when the storage facility contained approximately four million gross pounds of goods, the contracting officer confirmed that the first firewall was completed and inspected. In December 2008, the contracting officer confirmed that the second firewall was completed. The contracting officer again corresponded with both Guardian's representatives and the contracting officer's representative in April 2009 to confirm the third firewall was completed.

Even if Guardian did not complete the firewalls in a timely fashion to provide firewall separation for every three million gross pounds of stored goods, the contracting officer had the discretion to waive minor defects in Guardian's performance. *See* 48 C.F.R. § 46.407(d) (2009), "Nonconforming supplies or services" ("If the nonconformance is minor, the cognizant contract administration office may make the determination to accept or reject, except where this authority is

withheld by the contracting office of the contracting activity."). The contracting officer monitored Guardian's compliance with the firewalls and confirmed each completed firewall was inspected and approved. The contracting officer concluded, "I had no reason to believe that Guardian was not in compliance with the firewall requirement and was capable of storing over 9M pounds of storage at the Hampton, VA facility." Moreover, the slight delay in having the proper number of firewalls under the Hampton, Va. Contract does not necessarily require a finding of unacceptable past performance. Further, Guardian's past performance on two other contracts that the contracting officer did not administer was acceptable, as both questionnaires gave Guardian Excellent ratings, and both indicated Guardian would be award contracts again if given the opportunity. Taken as a whole, it was reasonable for the contracting officer to rate Guardian's past performance as acceptable, with a Pass rating.

Finally, the plaintiff emphasizes that because the contracting officer also was the contracting officer on the East Coast Contracts, "she was not at liberty to disregard information known either to herself or by the Contracting Officer's Representative," and was required under FAR 15.305(a)(2)(ii) to consider "any additional information obtained from any other sources when evaluating past performance." However, contrary to the plaintiff's assertions, the contracting officer did consider her past experience with Guardian on the East Coast Contracts in evaluating Guardian's past performance. As the contracting officer herself specifically noted, "I considered my own experience as the Contracting Officer for the East Coast contract the Agency has with Guardian.... I receive monthly evaluations from the on-site COR [contracting officer representative] who monitors Guardian's performance ... on a daily basis. Through these monthly evaluations and my personal experience, I determined that Guardian has consistently met the Government's requirements...." Furthermore, while discussing Guardian's use of TOPS, the contracting officer concluded that "[b]ased upon the Past Performance evaluations that I reviewed, and on my own experience with Guardian's performance of the previous contracts and its use of the TOPS system, I concluded that Guardian's past performance rating is PASS." While the plaintiff disagrees with the conclusions drawn by the contracting officer in rating Guardian's past performance with a Pass, there is no evidence that the contracting officer failed to consider all the relevant evidence in reaching her decision. The plaintiff has failed to demonstrate that the contracting officer was obligated to give Guardian a rating of Fail for past performance, or why "extreme doubt exists" that the Guardian could successfully perform under the West Coast Contract. In sum, plaintiff has not met its " 'heavy burden' " of showing that SDDC's determination that Guardian had acceptable past performance " 'had no rational basis.' " *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d at 456).

*Technical Evaluation*

A. Amount of Warehouse Storage Space Required

The parties disagree as to whether Guardian's proposal met the technical requirements of the solicitation. The plaintiff argues that the Agency was required by law to reject Guardian's revised proposal because it failed to conform to the solicitation requirements, for both the amount of warehouse storage space required and the length of the lease required. The defendant asserts that "as long as a rational basis and relevant factors are considered, the agency's action must be sustained."

As discussed above, the United States Court of Appeals for the Federal Circuit has stated that a protestor has a heavy burden in demonstrating that the award to another offeror was without a reasonable basis. Additionally, a disappointed bidder in a bid protest must show a " 'clear and prejudicial violation of applicable statutes or regulations.' " *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d at 1169). According to the Federal Circuit:

> Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." [*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d] at 1332. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332–33 (citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice under this second ground, a protester must show that there was a "substantial chance" it would have received the contract award absent the alleged error. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999).

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d at 1351. The Federal Circuit has reiterated how a protestor may demonstrate prejudice: "A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed.Cir.2009) (citing *Bannum, Inc. v. United States*, 404 F.3d at 1358); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d at 1331 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d at 1582 ("To establish prejudice, the claimant must show that there was a 'substantial chance' it would have received the contract award but for that error.")). "In other words, the protestor's chance of securing the award must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319.

The Federal Circuit recently identified what would demonstrate a violation of applicable statutes or regulations in a bid protest. In *Centech Group, Inc. v. United States*, the Federal Circuit indicated: " '[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.' " *Centech Group, Inc. v. United States*, 554 F.3d at 1038 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d at 448); *see also Alfa Laval Separation, Inc. v. United States*, 175 F.3d at 1367–68; *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed.Cl. 488, 505 (2009). In *Centech*, the Federal Circuit further explained that, "[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." *Centech Group, Inc. v. United States*, 554 F.3d at 1037. One trial level opinion noted that, "a court will only overturn an agency's determination that an offeror's bid satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious." *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. at 505 (citing *E.W. Bliss Co. v. United States*, 77 F.3d at 448). The court in *Blackwater* also noted that, "[a] solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid." *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed.Cl. at 505. Therefore, an agency's determination that a proposal is acceptable may be deemed arbitrary and capricious if the proposal did not provide what was called for in the solicitation.

The parties not only disagree as to whether Guardian's revised proposal met the technical requirements of the solicitation, but also disagree as to whether the solicitation's Performance Work Statement was part of the solicitation and should be part of the selection process. The solicitation was designed to identify "the responsible low priced technically acceptable offeror with acceptable past performance." The Technical Evaluation factor stated: "[t]he Government will evaluate the offeror's technical proposal to

determine whether the information provided by the offeror in its proposal demonstrates compliance with solicitation requirements, understanding of requirements, and ability to provide non-temporary storage services and administration...." The technical requirements were evaluated on a pass/fail basis [9] and the solicitation required that an offeror receive an acceptable rating on all five individual Technical Evaluation sub-factors to be determined technically acceptable.[10] Guardian's technical proposal included a proposed warehouse, which was an approximately 115,000 square foot facility and part of a larger 230,000 square foot industrial complex. Guardian was to be the sub-tenant of the building's lessee, and Guardian's portion of the facility would have approximately 108,546 square feet of usable storage space. Guardian's sublease agreement had a term, beginning "no later than April 17, 2009, and shall continue until January 31, 2017." The Technical Evaluation Team reviewed Guardian's technical proposal and rated each of the five Technical Evaluation sub-factors with a Pass, including Technical Evaluation sub-factor 5. The solicitation's Performance Work Statement states, in relevant part, in Section 3.1: "[t]he Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually."

The plaintiff argues that the Agency intended to use the Performance Work Statement in evaluating the technical proposals and that "Guardian failed to comply with the unambiguous language of the original RFP and the amended RFP, to submit documentation proving it could provide warehouse space sufficient to store up to 15 million pounds of HHG/UB annually at the time of the award." For support, the plaintiff cites to the solicitation's Basis for Award which requires the documentation submitted to "demonstrate a clear understanding of, and the ability to, accomplish the requirements stated in the Performance Work Statement (PWS)."

The plaintiff also cites to Amendment 0003 of the solicitation which was a series of questions and answers regarding the solicitation. One such question and answer was:

> Question [from offeror]—How much warehouse space is needed?
>
> Answer [from SDDC]—See RFP PWS Section 3.1. The Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually. The storage facility shall be capable of storing personal property containers that usually sized ninety-six (96) inches long by forty-two (42) inches wide by eighty-four (84) inches high. For safety reasons, the Contractor shall not stack more than four (4) personal property containers on top of each other.[11]

Plaintiff estimates that Guardian's 108,546 square feet of leased usable storage space proposed in Guardian's revised proposal could store approximately 8.14 million pounds, or, in a second calculation by plaintiff, as much as 9,093,614 pounds, estimates which have not been contradicted by either

9. The definitions of Technical Evaluation assessment ratings were: "PASS—Contractor's proposal meets all requirements on the evaluation factors. FAIL—Contractor's proposal does not meet all requirements on the evaluation factors."

10. The five Technical Evaluation sub-factors in the solicitation were:
Sub-factor 1—Verification from qualified engineer or authority that facility does not fall within one hundred (100)-year flood plain.
Sub-factor 2—Certificate of Warehouseman's Legal Liability Insurance.
Sub-factor 3—Fire system maintenance contract. Facility(ies) must have a Sprinkler and Detection and Reporting system that is recognized and is receiving rate credit by the appropriate insurance rating organization.
Sub-factor 4—Evidence of maintaining a primary and secondary locator system that shows identification of lots stored.
Sub-factor 5—Proof of ownership, lease or written commitment for sufficient warehouse space. After Amendment 0006, Technical Evaluation sub-factor 5 stated: "[p]roof of ownership or lease agreement for warehouse space. If a lease is proposed, it must bind the offeror upon award if the offeror's proposal is successful."

11. Attached to Amendment 0003 was a copy of a Performance Work Statement. While there were slight variations between the Performance Work Statement attached to Amendment 0003 and the original Performance Work Statement, none of the differences were material to the issues under consideration.

the Intervenor Guardian or the government. Guardian only cites to the calculations by the Western Regional Storage Management Office during the pre-award survey for Guardian's initial proposal, indicating that Guardian's warehouse could store between 7,087,500 and 9,450,000 pounds of storage, depending on the configuration, and argues that since the contracting officer concluded the initial warehouse was sufficient to store SDDC's goods, and the warehouse in the revised proposal was larger, the warehouse offered in the revised proposal must be sufficient. Neither Guardian, nor the defendant, argue that Guardian's proposed warehouse space was sufficient to store up to 15 million pounds of storage.

Defendant contends that "MVS's interpretation that offerors were required to possess 15 million pounds of available storage space at the time of the award is unreasonable on its face because the solicitation does not incorporate the requirements of the PWS [Performance Work Statement] into the evaluation criteria. In fact, the only mention of the PWS in either the instructions to offerors or the evaluation criteria is in the 'basis for award....'" Defendant states: "SDDC's election to amend the evaluation criteria while leaving the PWS unchanged supports our [defendant's] contention that SDDC never intend [sic] to incorporate the requirements of the PWS in the evaluation criteria because SDDC would have modified the PWS as well as sub-factor 5, when revise [sic] the solicitation." [12]

The intervenor also offers the contracting officer's statement in the Agency Report in response to MVS' second GAO protest, that "[t]he 15 million pounds referenced in the PWS [Performance Work Statement] is a contract maximum, as opposed to a requirement for contract start." In the Agency Report in response to MVS' second GAO protest, the contracting officer stated that it would be "unreasonable for SDDC to expect the successful offeror to enter into a binding lease for warehouse space sufficient to provide storage for the maximum quantity of storage stated in the RFP with no guarantee that the government will pay the contract or to store goods to fill that space." In the Agency Report, the contracting officer concluded that "the contractor can anticipate a net storage of 3,650,000 pounds per year."

The intervenor continues that "the purpose of the PWS was to advise offerors of the 'obligations of the Contractor and the Government,' during contract performance, i.e. after award. The PWS was not referenced or incorporated in the evaluation factors or sub-factors, and thus the Agency could *not* use the PWS provisions as a yardstick in the proposal evaluation to determine whether an offeror's technical proposal should be given a 'Pass' or a 'Fail.'" (emphasis in original). The intervenor further asserts that "Section 3.1 of the PWS is not cited or incorporated by reference in any of the evaluation factors in either the initial or amended RFP," and also cites to the Agency's Report in response to MVS' second GAO protest.

12. The original sub-factor 5 under the Technical Evaluation factor required: "Proof of ownership, lease or written commitment for sufficient warehouse space." Amendment 0006 changed the language of sub-factor 5 to read: "Proof of ownership or lease agreement for warehouse space. If a lease agreement is proposed, it must bind the offeror upon award if the offeror's proposal is successful." The basis for the amendment was to clarify that it was acceptable for a lease proposal in response to the solicitation to bind an offeror only if the offeror received the award, and that clarification is, in fact, found in the above amended language. The court reads nothing else into the loss of the word "sufficient" from the original language to the language in Amendment 0006, particularly when the purpose of Amendment 0006 was not to change the amount of warehouse space, but to clarify that the lease could have a limited contingency, that is, the lease only needed to be operable if the offeror received the award. For one thing, Amendment 0003, which, through an offeror's question and SDDC's answer, tied the offerors' proposed leases to the up to 15 million pounds of storage needs in the Performance Work Statement (PWS), was not changed, and remained controlling. Nor was the Performance Work Statement itself and its call for up to 15 million pounds of storage capacity changed. The language of Amendment 0006 called for a proposed "lease agreement for warehouse space." The answer to just how much Amendment 0006 "warehouse space" should be included in an offeror's proposed lease, a factor, which is a material part of any lease, was provided by the Performance Work Statement.

Regarding the question and answer in Amendment 0003 to the RFP, in which an offeror asked SDDC how much warehouse storage space was needed, the government cited to Section 3.1 of the Performance Work Statement, and stated: "The Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually." The defendant maintains that "[n]othing in the plain language of the foregoing answer indicates that SDDC intended to amend the evaluation criteria and require offerors to demonstrate in the proposals that they could provide space for up to 15 million pounds of storage at the time of the award." The intervenor addresses the question and answer in Amendment 0003 by arguing that "[t]his question does not indicate whether the question pertains to the space needed for a compliant proposal, or the space needed to perform the contract." According to the intervenor, the Agency understood it to mean the latter.

The plaintiff responds:

> While somewhat creative, such a distinction [warehouse space for an offeror's proposal versus warehouse space to perform the contract] is illogical and unpersuasive considering the answer to the question was "See RFP PWS Section 3.1. The Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually." The offeror asking the question would undoubtedly have been concerned with compliance with proposal requirements. By referring to the PWS in the answer, the Agency acknowledged that the evaluation criteria referenced in the PWS, and therefore the answer logically applied to both the proposal and the contract requirements.

The court agrees with plaintiff that the only reasonable interpretation of the warehouse space question and answer in Amendment 0003 is that the parties were to offer up to 15 million pounds of storage capacity so that such an amount of storage space would be available under the contract, if necessary, with no further contractual activity required. Under the government's and intervenor's theory, an offeror could, with impunity, provide virtually any storage capacity it wished, and somehow still be compliant with the solicitation, unconstrained by stated government requirements. Defendant's and intervenor's theory necessarily would have offerors proposing widely differing storage capacity, resulting in an impossible price evaluation, and would render meaningless SDDC's citation to the Performance Work Statement and storage needs in response to the question in Amendment 0003 on the amount of space required.

Although the intervenor relies on the contracting officer's statement that it would be "unreasonable for 'SDDC to expect the successful offeror to enter into a binding lease for warehouse space sufficient to provide storage for the maximum quantity of storage stated in the RFP with no guarantee that the government will pay the contractor to store goods to fill that space,'" and that, "[t]he 15 million pounds referenced in the PWS is a contract maximum, as opposed to a requirement for contract start," the court relies on the plain words of the solicitation and the solicitation's Performance Work Statement. Guardian and the other offerors were required by the solicitation to provide a lease, which (1) would become operative if an offeror, including Guardian, received the award from SDDC, and (2) under which it could provide either up to 15 million pounds of storage space, or, a lease arrangement providing, contingent only on contract award, "up to" 15 million pounds of storage space. In contrast, Guardian proposed to provide between 8 and 9 million pounds of storage. If over 9 million pounds of household goods and unaccompanied baggage had been presented for storage, Guardian would have not had a guaranteed lease or commitment to provide that amount of available space.

The plaintiff also argues that, when the solicitation's evaluation factors refer to "requirements,"[13] and "work ef-

13. Basis for Award: Demonstrate "a clear understanding of, and the ability to, accomplish the requirements stated in the Performance Work Statement (PWS)." Technical Evaluation factor: Demonstrate "compliance with solicitation requirements," and "understanding of require-

forts,"[14] to give those words meaning, they "must refer to the PWS." "The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts." *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1353 n. 4 (citing *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d at 997–98 (interpreting a solicitation using contract interpretation rules)). "We must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *States Roofing Corp. v. Winter,* 587 F.3d 1364, 1374 (Fed.Cir.2009) (Lourie, J., dissenting) (quoting *United Int'l Investigative Serv. v. United States,* 109 F.3d 734, 737 (Fed.Cir.1997)). The United States Court of Appeals for the Federal Circuit also has stated that a court "must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr. Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996) (citing *Hughes Commc'ns Galaxy, Inc. v. United States,* 998 F.2d 953, 958 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.1993)).

The Technical Evaluation factor stated: "[t]he Government will evaluate the offeror's technical proposal to determine whether the information provided by the offeror in its proposal demonstrates compliance with solicitation requirements, understanding of requirements, and ability to provide non-temporary storage services and administration...." The solicitation's Basis for Award required that the documentation submitted "demonstrate a clear understanding of, and the ability to, accomplish the requirements stated in the Performance Work Statement (PWS)." Furthermore, Technical Evaluation sub-factor 5 required a "lease agreement for warehouse space." The solicitation's Performance Work Statement informs how much space is required and for how long the space must be available under the contract. If the solicitation and the technical requirements are to make sense, the requirements of Section 3.1 of the Performance Work Statement must not be read out of the solicitation. Therefore, the requirements of Performance Work Statement 3.1 must be read along with the evaluation criteria. The solicitation required submission of proof of ownership or a lease by an offeror, which complied with the requirement in the Performance Work Statement that "up to fifteen million (15,000,000) gross pounds of personal property" be available, or a lease, which would become operable for that amount of space upon award. Guardian's lease, which only provides for less than 10 million pounds of storage space, does not meet the requirements of the solicitation and is not responsive to the solicitation. To meet the minimum needs of the solicitation, Guardian either needed to own a warehouse with 15 million pounds of available storage, have a lease commitment which provided for the availability of up to 15 million pounds of storage, or have a lease available, ready to sign, for the 15 million pounds of storage, in which the only contingency was failure to receive award of the contract. From the record it appears that MVS and Platinum Services, Inc. proposed enough space to store up to 15 million pounds; Guardian and Freight Hub, Inc. did not.

Despite efforts on the part of the defendant and the intervenor to argue that the Performance Work Statement was not a part of the solicitation, they do not cite to the court binding, or even persuasive, authority that states a Performance Work Statement is not part of a solicitation and may be ignored by an offeror, even when the Performance Work Statement provides material terms regarding the offerors' leases, required by the solicitation. To the contrary, there is a substantial body of law which indicates that a performance work statement or a statement of work is, in fact, part of the solicitation.

ments...." Cost/Price Evaluation factor: "A price proposal found to be unrealistically low may reflect a lack of understanding of requirements."

14. Past Performance: Substantiate past performance "in work efforts similar in size, scope, magnitude, complexity, and cost as those outlined in the PWS," and assess performance risk "as it relates to the probability of successful accomplishment of the required effort."

Indeed, multiple bid protest decisions, by both the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims have referenced a performance work statement or a statement of work as part of the solicitation. *See Tyler Constr. Group v. United States,* 570 F.3d 1329, 1331 (Fed.Cir.2009) ("The solicitation described in general terms the facilities to be constructed under the initial task order. It included a 252–page statement of work outlining in detail the other types of facilities to be built. 'The statement of work does not indicate where these facilities are to be built; it does, however, inform offerors that the facilities will be required primarily at Fort Benning, Georgia.'");[15] *Kerr Contractors, Inc. v. United States,* 89 Fed.Cl. 312, 322 (2009) (the court referenced the estimated maximum work depth in the solicitation's statement of work); *Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed. Cl. at 493 ("Under the 'Training Requirements' section of the Statement of Work ('SOW'), the Solicitation described the MAA Class "A" School training program's purpose...."); *Erinys Iraq Ltd. v. United States,* 78 Fed.Cl. 518, 530 (2007) ("The details of the contract requirements for each CLIN are explored in considerable detail in the Performance Work Statement (the 'PWS') that formed part of the solicitation."); *Protection Strategies, Inc. v. United States,* 76 Fed.Cl. 225, 228 (2007) ("In addition, in the solicitation's Statement of Work, the NNSA [National Nuclear Security Administration] indicated that vulnerability assessments, operational security functions, and the drafting of the site safeguards and security plan were to be performed by 'Q-cleared' personnel."); *CIGNA Gov't Servs., LLC v. United States,* 70 Fed.Cl. 100, 102 n. 6 (2006) ("The findings of fact are based upon the administrative record (AR) and the statement of work (SOW) in the solicitation...."); *Asia Pacific Airlines v. United States,* 68 Fed.Cl. 8, 20 (2005) ("The government challenges Asia Pacific's interpretation of the Solicitation as unreasonable, and suggests that Asia Pacific should have been guided by the 'Statement of Work' section of the Solicitation instead of the 'Evaluation' section."), *appeal dismissed,* 171 Fed.Appx. 837 (Fed. Cir.), *appeal dismissed,* 175 Fed.Appx. 346 (Fed.Cir.2006); *Chapman Law Firm v. United States,* 63 Fed.Cl. 519, 534 (2005) ("During additional discussions by letter dated April 27, 2004, HUD [the Department of Housing and Urban Development] again questioned whether Chapman 'fully underst[ood]' the marketing requirements under the Solicitation's performance work statement and asked Chapman to explain how its marketing plan to hire statewide listing brokers complied with the performance work statement requirement that local listing brokers 'be located within a reasonable proximity to the listed property.'"), *aff'd,* 163 Fed.Appx. 889 (Fed.Cir.2006).

The defendant and intervenor strenuously try to argue that the Performance Work Statement is not part of the solicitation, and not only may be ignored, but must be ignored. An examination of the solicitation as a whole, however, including the evaluation criteria and SDDC's response to an offeror's question about how much warehouse space was required, in which SDDC replied, "[s]ee RFP PWS Section 3.1. The Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually," demonstrate to the contrary. The Performance Work Statement is an integral part of the solicitation at issue and, under these facts and circumstances, Guardian's lease was required to comply with the Performance Work Statement requirement for up to 15 million pounds of storage. Offerors were required to propose a lease for storage space, which was or automatically would become operational upon contract award. The amount of available storage space required must be part of both a solicitation and a responsive proposal, so the government can evaluate the offers. Without a specific quantity identified in a lease, that lease would be virtually meaningless. The Performance Work Statement provided the answer as to what quantity of

15. If the statement of work in *Tyler Construction Group* could be ignored, the parties could have proposed construction at locations other than Fort Benning, and still be compliant with the solicitation.

available space was required—up to 15 million pounds of storage, not up to 8.14 or 9.1 million pounds as offered by Guardian. Under defendant's and intervenor's reasoning, an offeror's lease for storage space could ignore the Performance Work Statement in the solicitation, and put virtually any number in its proposed lease, which is what happened in this case, with storage offers ranging from 20,500 square feet to 260,000 square feet. However, any amount less than space for up to 15 million pounds fails to meet the minimum requirements of the solicitation. In fact, Platinum Services, Inc.'s proposal offered a lease with 60,000 square feet, with "the available opportunity to lease additional storage space up to 200,000 square feet." Although, Guardian, in its proposal for the Hampton, Va. Contract, provided a lease proposal with 134,589 square feet of warehouse space, which had a right of first offer for an additional, contiguous 16,860 square feet of warehouse space, for the West Coast Contract, Guardian choose not to include a contingency for additional warehouse space in its technical proposal, and as a result, only offered less than 10 million pounds of storage space. Guardian should have understood the requirement, but instead proposed a lease for an amount of capacity significantly less than the required amount, and could not, at the time of proposal or award guarantee that it could store up to 15 million pounds.

Even if SDDC now suggests it intended another result, a government agency is responsible for the language it includes in its solicitation, upon which offerors rely. Plaintiff relied on a reasonable interpretation of the solicitation, and further relied on the offeror's question of how much storage should be reflected in the offerors' proposed leases. All the offerors could read the language indicating that up to 15 million pounds of storage capacity was required by the Performance Work Statement. Moreover, even at the time of the question and answer reflected in Amendment 0003 to the solicitation, the Agency reiterated the 15 million pounds capacity parameter.

The government drafted the solicitation at issue, and is deemed responsible for the language contained therein under the rule of *contra proferentem.* The United States Court of Appeals for the Federal Circuit, in a recent decision, explained the rule of *contra proferentem* in the context of a government contract:

> if some substantive provision of a government-drawn contract is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted, unless the parties' intention is otherwise affirmatively revealed. This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling.... If the [government] chafes under the continued application of this check, it can obtain a looser rein by a more meticulous writing of its contracts and especially of the specifications." This rule of *contra proferentem* continues to apply, as illustrated in *Lockheed Martin IR Imaging Systems,* 108 F.3d at 322, where this court declined to impose a contract interpretation sought by the Army but to which the contractor never intended to agree.

*States Roofing Corp. v. Winter,* 587 F.3d at 1368–69. The Federal Circuit has stated that the rule of *contra proferentem* also applies in a bid protest. *See Blue & Gold Fleet, L.P. v. United States,* 492 F.3d at 1313–14 (the rule of *contra proferentem* "appl[ies] with equal force in the bid protest context."); *see also Rotech Healthcare Inc. v. United States,* 71 Fed.Cl. 393, 406 (2006) ("No part of the RFP indicates, in any way, that the VA [United States Department of Veterans Affairs] will not apply that rule [of *contra proferentem* ]. If, as the government suggests, some portions of RFP 583 conflicted with one another, the court concludes that the conflict created, at best, a latent ambiguity which must be construed against the government, as drafter, under the principle of *contra proferentem.*" (citing *Turner Constr. Co. v. United States,* 367 F.3d 1319, 1321 (Fed.Cir.2004))), *appeal dismissed,* 214 Fed. Appx. 973 (Fed.Cir.2006); *Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 629 (2002) ("When there is a latent ambiguity, the rule of *contra proferentem* 'puts the risk

of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; ... and it saves contractors from hidden traps not of their own making.'" (quoting *Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970))). Under these facts, if SDDC did not craft the solicitation as artfully as it should have, SDDC will be responsible for the resulting impact on the procurement.

The Performance Work Statement was part of the solicitation, and could not be ignored as defendant and intervenor would have the court do. The Performance Work Statement informed the warehouse lease requirements regarding storage space capacity and also duration, discussed below, which had to be met by offerors submitting proposals. For Guardian's proposal to be acceptable, the proposal had to provide for warehouse space sufficient to store "up to" 15 million pounds of storage. At no point have defendant or intervenor even suggested that Guardian's proposal satisfied this requirement that "[t]he Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually."

Defendant asserts that, "[e]ven if we assume, for the sake of argument, that the requirements in the PWS were incorporated into the evaluation criteria, offerors would only have had to demonstrate that they could provide up to 15 million pounds of storage annually, and not at the time of award as MVS alleges." Because the Performance Work Statement uses the terms "up to" and "annually," the defendant argues the Performance Work Statement "did not specifically or generally indicate offerors are expected to possess storage to hold up to 15 million pounds of personally property." Despite defendant's argument, nothing in the Performance Work Statement indicates that offerors were not required to have 15 million pounds of storage available at the time of the proposal. Indeed, if an offeror chose to submit a proposal in response to the solicitation, the term "up to" indicates the amount of space that the offeror was required to have available to be responsive to the solicitation, i.e., up to 15 million pounds of storage. If it was SDDC's intention to permit less than 15 million pounds of storage, SDDC should have so specified in the solicitation or the Performance Work Statement. Defendant's reading of the 15 million pounds of storage, adds uncertainty and effectively abandons the requirements, permitting offerors to conjure, on their own, the square footage for the leases they were required to submit. The square footage proposed by each of the offerors was divergent, with differing abilities to meet SDDC's storage requirements. Under defendant's reading, apparently any offered storage capacity would do. If this reading of the storage requirements was SDDC's intention, defendant should have made that intention clearer by assisting offerors to understand the requirements, and thereby to avoid needless litigation. What the space provision did not include was language to allow offerors to propose some storage space by the solicitation closing date and increase available space as needed. To the extent the terms "up to" or "annually" were unclear, they were unclear due to SDDC's drafting. As noted above, the government is deemed responsible for the language contained in the solicitation and the Performance Work Statement under the rule of *contra proferentem.*

The parties have stipulated that Guardian's proposal offered a warehouse facility with "108,546 square feet of useable storage space" and twenty-six foot high ceiling clearance which "would allow Guardian to store containers no more than three high." Given these figures, plaintiff calculated that Guardian would be able to store 8.14 million pounds of household goods and unaccompanied baggage.[16] Subsequently, using a different cal-

16. The plaintiff reached the figure of 8.14 million pounds by applying the following calculation: "8.14 M lbs = 3M lbs × 108,546 sq. ft. ÷ 40,000 sq. ft." The calculation derives from the plaintiff's belief that in older warehouses, five 40,000 square feet warehouses are required to store 15,000,000 pounds of storage. For each of calculation, the plaintiff reduced the five 40,000 square foot warehouses to one 40,000 square foot warehouse and likewise reduced the 15,000,000 pounds by a factor of 5 to 3,000,000. The plaintiff next multiplied the 3,000,000 pounds by the amount of Guardian's square feet of usable storage space (108,546 square feet) and divided by

culation, the plaintiff derived a maximum figure of 9,093,614 pounds that Guardian could probably store in its proposed 108,546 square feet of usable warehouse space.[17] Using either calculation, Guardian did not and could not guarantee that it could store up to 15 million pounds. Intervenor offers the figures in the government's pre-award survey on the initial lease of between an estimated 7,087,500 and 9,450,000 pounds of storage, for Guardian's lease. Using any of these amounts, the court concludes that Guardian's proposal could not satisfy the requirement of warehouse space sufficient to guarantee storage of up to 15 million pounds.

In the present case, SDDC demonstrated a clear violation of the applicable regulation or procurement procedure by considering Guardian's technical proposal acceptable. Although deference may be afforded to the conclusions of the Agency's Technical Evaluation Team in the proper case, *see Afghan American Army Services Corp. v. United States,* 90 Fed.Cl. 341, 355 (2009), in this case, the Technical Evaluation Team determined that Guardian's technical proposal met the evaluation criteria and awarded it a Pass, even though the proposal did not meet the minimum requirements of the solicitation. " '[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.' " *Centech Group, Inc. v. United States,* 554 F.3d at 1038 (quoting *E.W. Bliss Co. v. United States,* 77 F.3d at 448). The warehouse space was a material term of the lease, which was required by the solicitation. *See Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed.Cl. at 505 ("A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid."). The warehouse space proposed by Guardian failed to conform to the material terms and conditions of the solicitation, and the Technical Evaluation Team and the Agency should have determined that Guardian's proposal was unacceptable. The Agency was " 'strictly bound by its terms [of the request for proposal],' and in accepting Guardian's proposal, the Agency "violated a clearly applicable procurement statute and regulation." " *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367–68 (quoting *Alfa Laval Separation, Inc. v. United States,* 40 Fed.Cl. 215, 230 (1998)).

In this regard, the court in *Carahsoft Technology* stated:

In negotiated procurement, a proposal that fails to conform to the solicitation's material terms and conditions is technically unacceptable and ineligible for contract award. *See E.W. Bliss Co. v. United States,* 77 F.3d [445,] 448 [ (Fed.Cir.1996) ] ("In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."). Thus, the concept of technical acceptability is roughly analogous to that of responsiveness in sealed bidding. *Cf.* FAR 14.301(a) (titled "[r]esponsiveness of bids" and providing, "To be considered for award, a bid must comply in all material aspects with the invitation for bids."). The concepts are only roughly analogous because, unlike a non-responsive bid in sealed bidding where there is neither a competitive-range determination, nor subsequent rounds of discussions and offer revisions, a technically unacceptable proposal may be considered for award if the proposal would otherwise be competitive and if its technically unacceptable terms

the 40,000 square feet of warehouse space to arrive at the estimated amount of pounds of storage Guardian's warehouse could accommodate.

17. The plaintiff arrives at the figure of 9,093,614 pounds by applying the following formula: 9,093,614 = 108,546 sq. ft. × 7,087,500 lbs ÷ 84,600 sq. ft. The calculation is derived from the plaintiff applying what a fire marshal stated Guardian's first proposed warehouse could hold (7,087,500 square feet), divided by the amount of usable space in the first proposed warehouse (84,600 square feet), and multiplied by the amount of usable square feet in the proposed warehouse in Guardian's revised proposal (108,546 square feet). The result is, according to the plaintiff, a warehouse with an estimated 9,093,614 pounds of storage.

can be cured by the offeror in a revised proposal. *See Birch & Davis Int'l, Inc. v. Christopher,* 4 F.3d 970, 974 (Fed.Cir.1993) ("'[A] proposal must generally be considered in the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless.'" (quoting *M.W. Kellogg Co. v. United States,* 10 Cl.Ct. 17, 23 (1986); *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 841 (1999) ("[T]echnically unacceptable proposals must generally be considered to be within the competitive range if capable of being made technically acceptable and if the proposal's cost or price term is competitive."))).

However, as this court noted in *Labat–Anderson, Inc.:*

> The situation is different with respect to [Final Proposal Revisions].... Because an agency generally may not re-open discussions after the submission of [FPRs], and because a technically unacceptable proposal cannot be considered for award, agencies must generally exclude a technically unacceptable [FPR] from the competitive range, regardless of cost or price.

42 Fed. Cl. at 841.

*Carahsoft Tech. Corp. v. United States,* 86 Fed.Cl. 325, 341–42 (2009) (footnote omitted; alterations in original); *see also Dyonyx, L.P. v. United States,* 83 Fed.Cl. 460, 468 (2008) ("Although responsiveness is generally used to describe sealed bids, the same concept applies to final offers submitted after negotiations. Just as a sealed bid that does not meet the minimum solicitation requirements is non-responsive and cannot be considered for contract award, FAR § 14.301(a), a Final Proposal Revision that does not conform to the solicitation requirements is technically unacceptable and cannot be considered for award unless the agency reopens negotiations for all offerors or modifies the solicitation. *See* FAR § 15.307(b)[.]" (quoting *Dismas Charities, Inc. v. United States,* 75 Fed.Cl. 59, 61 (2007))) (other citation omitted).

The solicitation in the present case was nominally a negotiated procurement, and employed an RFP, but was conducted in several important ways like a sealed bid procurement. The solicitation advised offerors that the government was not obligated "to determine a competitive range, conduct discussions, solicit or entertain revised or Final Proposal Revisions," and the government did none of these. Although the government reserved the right to conduct discussions if deemed necessary, discussions were not conducted, nor were the other above listed procurement activities, which generally accompany a negotiated procurement. The solicitation further stated:

> This is a low priced technically acceptable Request for Proposal with a Past Performance Evaluation. An award will be made to the responsible low priced technically acceptable offeror with acceptable past performance. In the event that the low priced offeror is technically acceptable and has an acceptable past performance rating, award shall be made to that offeror. No other proposals will be considered for award at this point and the evaluation process will end.

The Agency described the solicitation at issue as a "Low Price Technically Acceptable Request for Proposal with a Past Performance Evaluation." Guardian was the low priced offeror, and after Technical and Past Performance evaluations, was deemed technically acceptable, with acceptable past performance. These Agency conclusions ended the evaluation process, with award made to Guardian. Guardian's proposal, however, was unacceptable and the award therefore was improper. Guardian's revised proposal did not meet the minimum, material requirements of the solicitation, with regard to the amounts of guaranteed storage available, and also as to the length of lease offered (addressed below).

Nonresponsive bids in sealed bidding violate 10 U.S.C. § 2305(b)(3) (2006), which provides that award shall be made to the "responsible bidder whose bid conforms to the solicitation and is most advantageous to the United States, considering only price and the other price-related factors included in the solicitation." Although having similar elements, the present Low Price Technically Acceptable Request for Proposal with a Past

Performance Evaluation was not a sealed bid device. The FAR 15, "Contracting by Negotiation" device employed in the present case is described at FAR 15.101–2, "Lowest price technically acceptable source selection process." The FAR provides: "Solicitations shall specify that award will be made on the basis of the lowest evaluated price of proposals meeting or exceeding the acceptability standards for non-cost factors." 48 C.F.R. § 15.101–2(b)(1) (2009); *see also Carahsoft Tech. Corp. v. United States,* 86 Fed.Cl. at 349 n. 22 (discussing FAR 15.101–2).

The solicitation at issue required an acceptable or a Pass rating for the Technical Evaluation factor, including Technical Evaluation sub-factor 5, the proof of ownership or lease agreement for warehouse space. Warehouse space was specifically tied to Section 3.1 of the Performance Work Statement, contained in the solicitation, and based on a response from the Agency to an offeror's question about warehouse space, as evidenced in Amendment 0003 to the solicitation. Section 3.1 of the Performance Work Statement sets requirements of capacity to store up to 15 million pounds of goods, for up to 9 years and 6 months. Even without the Agency's response to an offeror's warehouse space question reflected in Amendment 0003, ownership of a warehouse with sufficient available space, a lease agreement with sufficient available space, or a lease with sufficient available space contingent only on contract award was required by the solicitation, including the Performance Work Statement which provides the necessary, material requirements for the warehouse leases—how much storage space, and for how long. In this opinion, the court concludes that Guardian's proposal guaranteed less than 15 million pounds and less than 9 years, 6 months (as addressed below), and, therefore, was an unacceptable proposal. Award to Guardian under these circumstances violated FAR 15.101–2, which requires award to the offeror with the lowest price, but also with a technically acceptable proposal. In addition, an award to a proposal which does not meet the minimum requirements of the solicitation and, thereby, is technically unacceptable, is unreasonable, arbitrary and capricious. Under either or both grounds, the warehouse storage award to Guardian, given the facts and circumstances presented in the record before the court, was improper.

As discussed above, in addition to establishing that an agency violated the procurement statutes and regulations, the protestor also must demonstrate that it was prejudiced by the Agency's error. *See Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1351; *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332. In the present case, MVS' proposal included two warehouses, one with 104,494 square feet and the other warehouse with 92,400 square feet. The total of 196,894 square feet is far greater than Guardian's total of 108,546 square feet, and neither Guardian nor the defendant has suggested that plaintiff, which also was the incumbent on the West Coast Contract, could not meet the storage requirement of up to 15 million pounds of storage. Furthermore, MVS was the next lowest price offeror after Guardian. The court, therefore, concludes that MVS, "but for the error, [ ] would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States,* 577 F.3d at 1378 (citing *Bannum, Inc. v. United States,* 404 F.3d at 1358); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331; *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319. The court concludes that MVS' chance of securing the award was not insubstantial, and that MVS was prejudiced by SDDC's award to Guardian, based upon Guardian's unacceptable proposal.

B. Length of Lease Required

In addition to plaintiff's argument that Guardian's proposal failed to comply with the technical requirements of the solicitation because of an insufficient amount of warehouse space, plaintiff also argues that Guardian's proposal failed to comply with the technical requirements of the solicitation because Guardian's proposed lease did not cover the potential maximum length of the contract as required in the solicitation. The parties have stipulated that Guardian's lease has a "term beginning 'no later than April 17, 2009, and [continuing] until January 31, 2017,' a period

of less than eight and one half years...." The solicitation states that "[t]he period of performance is one base year with six option years and one thirty-month transition option," and "for a maximum period of nine (9) years and six (6) months." Paragraph 3.1 of the solicitation's Performance Work Statement states, in part, "[t]he Contractor shall either own the storage facility, or shall have a lease agreement for the storage facility in effect for the potential maximum performance period of the contract, which includes all possible option periods." The Performance Work Statement also states, "[t]he Contractor shall provide comprehensive non-personal non-temporary storage (NTS) services to the U.S. Army Military Surface Distribution and Deployment Command for a base period of twelve (12) months, six (6) one-year optional annual periods, and one (1) thirty (30) month transition period," or nine years and six months.

The defendant states that, "even if we assume, for the sake of argument, that paragraph 3.1 of the PWS [Performance Work Statement] did apply to the evaluation criteria, there is no logical reason, business reason, or any requirement for an offeror to possess a lease for the maximum performance period at the time of award when the solicitation only has a guaranteed base year." SDDC, however, did not state in the solicitation that the lease need only be for a one-year period, and none of the offerors proposed for a one-year lease period. If SDDC desired a one-year lease, SDDC should have so stated in the solicitation. Instead, the Agency requested proposals pursuant to a solicitation which required that "[t]he Contractor shall either own the storage facility, or shall have a lease agreement for the storage facility in effect for the potential maximum performance period of the contract, which includes all possible option periods." A government agency must state its requirements clearly in order to secure the goods or services necessary, at reasonable, best prices, with an eye towards avoiding unnecessary and protracted litigation. Further, it was not the plaintiff who drafted the language, rather, the Agency drafted the language, and must accept the consequences of its own drafting. *See States Roofing Corp. v. Winter,* 587 F.3d at 1368–69; *Rotech Healthcare Inc. v. United States,* 71 Fed.Cl. at 406; *Metcalf Constr. Co., Inc. v. United States,* 53 Fed.Cl. at 629.

Guardian's technical proposal included a sublease agreement, as Guardian was to be the sub-tenant of the building's lessee for the proposed facility. Guardian's sublease agreement was not dated on the first page, but a signature page for the lessor attached to Exhibit A to the sublease, "The Lessor's Consent and Estoppel Certificate," indicated an effective date of January 15, 2009. The sublease agreement had a term beginning no later than April 17, 2009, to continue until January 31, 2017, with an option to renew for the period from January 31, 2017 until August 31, 2018. This renewal option, if valid, would take Guardian's lease length past nine years and six months. The renewal option, however, was signed by Guardian and the lessee, but not by the owner. Exhibit A to the sublease, "The Lessor's Consent and Estoppel Certificate" states that, "[l]essor retains all rights set forth in the Master Lease, including without limitation, the right to approve or disapprove any further sublease or assignment of the Premises." As the renewal option was a further sublease of the premises, the lessor retained the right to approve or disapprove the option. The record contains no approval of the renewal option. The court concludes, therefore, that the option to renew was defective and invalid, and that Guardian's lease was for a period less than nine years and six months.

Intervenor Guardian claims that even if the solicitation had a nine and a half year term requirement, Guardian met the requirement. The intervenor notes that while Guardian's proposal included an Option For New Lease, that was signed by Guardian and the lessee, but not the owner, "on February 6, 2009, Guardian entered into a lease extension with HD Supply [the lessee], effective January 23, 2009, that extended Guardian's lease on the Wiegman Road warehouse to January 17, 2222[sic], for a total term of almost 11 years."

However, Guardian's argument that it had met the nine and a half year requirement

because it had subsequently executed a retroactive lease extension with the lessee on February 6, 2009, effective January 23, 2009, must fail. Intervenor cites to a declaration by the attorney who represented Guardian in negotiating the Option for New Lease, who states that the lease extension was executed on February 6, 2009, purporting to be retroactive to January 23, 2009. Despite the declaration included in the intervenor's brief, the Agency could not properly consider a lease extension entered into by Guardian and the lessee on February 6, 2009, as it was after the date the proposals were due to SDDC, on January 23, 2009. *See* 48 C.F.R. § 52.212–1(f)(2)(i), "Instructions to Offerors—Commercial Items (Nov.2007)" ("Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered unless [certain specific conditions are met] ...."); *see also Dubinsky v. United States,* 43 Fed.Cl. 243, 265 (1999) ("This provision [48 C.F.R. § 52.212–1(f) ], by its very terms, prohibits an agency from accepting revisions of offers submitted after the deadline established by an agency. It thus precludes an agency from accepting revisions of offers after the common cut-off date that it has set for revised proposals or final proposal revisions."), *appeal dismissed,* 215 F.3d 1350, 1999 WL 681521 (Fed.Cir. 1999); *Integrated Bus. Solutions, Inc. v. United States,* 58 Fed.Cl. at 428 (agency's rejection of bidder's proposal as late was rational and in accordance with law). Neither defendant nor Guardian have suggested that the February 6, 2009 lease extension ever was tendered to the contracting officer, or that there was a legitimate excuse for its lateness. Intervenor's unilateral attempt to declare an untimely lease extension timely fails.

Defendant argues that "MVS offers no plausible reason or justification for its conclusion that the owner of Guardian's proposed storage facility will reject the lease agreement." Defendant, however, is engaging in speculation in order to attempt to revive an otherwise invalid lease extension. Neither the court, nor MVS, needs to demonstrate a plausible reason for the owner of the Guardian's proposed facility to reject the lease extension. The owner had not signed the lease agreement for the option for the additional 19 months when the proposal was submitted to SDDC. The lease as submitted by Guardian in a timely fashion was not for the required length in the solicitation. Nor, as noted above, would it have mattered if the option to the lease agreement was subsequently signed by owner, for it would have been deemed late. *See* 48 C.F.R. § 52.212–1(f)(2)(i).

To rebut the plaintiff's argument that Guardian's proposal did not comply with the terms of the solicitation, both the defendant and the intervenor also argue that the solicitation's Performance Work Statement, and its 9 year, 6 month lease duration requirement, was not incorporated into the solicitation's Technical Evaluation factors. This argument has been addressed above, with respect to warehouse capacity. Offerors were required to submit leases capable of providing up to nine years and six months of storage. Guardian's lease did not meet this requirement.

The defendant and intervenor also attempt to rely on a letter from the Western Regional Storage Management Office to incumbent MVS and awardee Guardian, which included a list of required contractor submissions, including a copy of the contractor's lease. The letter stated the contractor's "lease must be for a minimum of one (1) year with an option to renew for an additional two (2) years. Month to month renewals are not acceptable." The defendant states that this letter demonstrates evidence that the solicitation did not require an offeror to possess a lease that was longer than three years. The intervenor also cites to a similar letter from the Western Regional Storage Management Office sent to Guardian after it had been awarded the first West Coast Contract. Like the letter sent to the MVS, the Western Regional Storage Management Office letter to Guardian listed required contractor submissions, including a copy of the contractor's lease. The provision regarding the lease stated, "the lease must be for a minimum of one (1) year with an option to renew for an additional two (2) years. Month to month

renewals are not acceptable." The intervenor, therefore, argues that this demonstrates that the "awardee was required to have only a three-year lease." The defendant's and intervenor's reliance on the letter from the Western Regional Storage Management Office is misplaced. The letter, at best, suggests that someone in the Agency, not someone with authority to amend the solicitation, thought offerors should enter into only three-year leases. The clear language of the solicitation's Performance Work Statement, however, requires a lease in effect for the potential maximum performance period of the contract, which includes all possible option periods, or 9 years and 6 months. Furthermore, letters sent only to the incumbent contractor and the contract awardee, not to all potential offerors, and not sent by the contracting officer, cannot trump the requirements of the solicitation issued. Neither the defendant nor Guardian offers a suggestion of how the other offerors were to divine that only a three-year lease was required, and not a lease for the "potential maximum performance period of the contract," as stated in the solicitation.

Guardian's technical proposal included a lease agreement that did not meet the requirements of the solicitation, a term of nine and a half years, for the potential maximum period of performance of the contract. The term of the lease was a material element of the solicitation. *See Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed. Cl. at 505. Guardian's proposal failed to "represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." *Centech Group, Inc. v. United States,* 554 F.3d at 1037. Guardian's technical proposal was unacceptable and should not have been selected for award by SDDC. In accepting Guardian's proposal, SDDC violated the solicitation requirements and FAR 15.101–2, "Lowest price technically acceptable source selection process." *See Centech Group, Inc. v. United States,* 554 F.3d at 1038; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367–68; *E.W. Bliss Co. v. United States,* 77 F.3d at 448. In sum, the defendant and the intervenor cannot demonstrate that Guardian's proposal met the lease requirements of the solicitation, and the court concludes that SDDC violated regulation and procurement procedure by accepting Guardian's proposal.

MVS has demonstrated "a clear and prejudicial violation of applicable statutes or regulations," *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d at 1169), and has further established prejudice by showing "that there was a 'substantial chance' it would have received the contract award absent the alleged error." *Banknote Corp. of America, Inc. v. United States,* 365 F.3d at 1351. MVS offered two alternative proposals, which were the second and third lowest priced offers after Guardian's. Based on the record currently available to the court, MVS' proposal appears to offer sufficient warehouse space and for the required length of time. In addition, as noted earlier, the award to Guardian based on a technically unacceptable proposal is unreasonable, arbitrary and capricious.

*Price Evaluation*

Plaintiff argues that the contracting officer "unreasonably found price reasonableness based on competition," that Guardian's prices were unrealistically low, given Guardian's lack of understanding that the RFP required the warehouse space to have the capacity to accommodate 15 million pounds of storage space. The defendant and intervenor argue that the contracting officer performed a detailed price analysis, properly found Guardian's price to be reasonable and not unreasonably low, and that the court should not disturb an agency's price evaluation unless it finds, by a preponderance of the evidence, that the price evaluation lacks a rational basis or that it violates a statute or regulation.

As discussed above, to set aside an award, the protester must show that the contracting officer's decision regarding the evaluation, including price, lacked a rational basis, or the procurement involved a prejudicial violation

of regulation or procedure. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33. "Whether the price estimate was reasonable is a discretionary determination regarding which this court will not substitute its judgment for the contracting officer's unless the officer's judgment was unreasonable." *SDS Int'l v. United States,* 48 Fed.Cl. 742, 759 (2001); *see also Textron, Inc. v. United States,* 74 Fed. Cl. at 326 (granting defendant's and intervenor's motions for judgment on the administrative record in part because plaintiff "has failed to show that the SSA [Source Selection Authority] or the USCG [United States Coast Guard] abused their discretion by acting arbitrarily and capriciously in finding that [intervenor's] price was both fair and reasonable."); *CC Distribs., Inc. v. United States,* 69 Fed.Cl. 277, 281 (2006) (granting government's motion for judgment on the administrative record in part because "[t]he price reasonableness determination was not arbitrary and capricious"); *Biospherics, Inc. v. United States,* 48 Fed.Cl. 1, 9 (2000) ("'The depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and we will not disturb such an analysis unless it lacks a reasonable basis.'" (quoting *Ameriko-OMSERV,* B–252879, B–252879.5, 94–2 CPD ¶ 219, 1994 WL 683264, at *3)).

The government may employ a number of methods to ensure that the government receives a fair and reasonable price. Price competition can establish the reasonableness of an offeror's price. *See Moore's Cafeteria Servs. v. United States,* 77 Fed.Cl. 180, 188 (2007) ("The CO [contracting officer] need not perform any technique of price analysis other than price competition unless the CO 'determines that information on competitive proposed prices ... is not available or is insufficient to determine that the price is fair and reasonable.'" (quoting 48 C.F.R. § 15.404–1(b)(3) (2009))), *aff'd,* 314 Fed.Appx. 277 (Fed.Cir.2008); *see also Med. Dev. Int'l, Inc. v. United States,* 89 Fed.Cl. 691, 704 (2009) ("The government may use a variety of techniques to ensure a fair and reasonable price." (citing 48 C.F.R. § 15.404–1(b)(2))); *Sealift, Inc. v. United States,* 82 Fed.Cl. 527, 538 (2008) ("'The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price.'" (quoting 48 C.F.R § 15.404–1(b))); *CC Distribs., Inc. v. United States,* 69 Fed.Cl. at 281 ("FAR § 15.404–1(b)(2) further provides: 'The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to, the following: (i) Comparison of proposed prices received in response to the solicitation. *Normally, adequate price competition establishes price reasonableness* ....' Thus, under FAR Part 15, comparison of the overall, or total prices submitted can constitute a sufficient analysis of price reasonableness. *See* FAR § 15.404–1(a)(1).") (emphasis in original).

The solicitation's Cost/Price Evaluation factor in the solicitation at issue stated that, "[p]rice will be evaluated for reasonableness based on the total proposed CLIN/SubCLIN prices for the nine (9) year and six (6) month period of performance." The evaluation approach stated, in part, that "[p]rice proposals will be analyzed for reasonableness and completeness, which may include a comparison of the offeror's proposed prices to those of other offerors, to prices paid under the same or similar contracts, and to other reasonable data. A price proposal found to be unrealistically low may reflect a lack of understanding of requirements."

On February 11, 2009, the contracting officer submitted the "Price Analysis Report for RFP W81GYE–08–R–0006," for the contracting officer's price analysis of the revised proposals, which stated that the "[p]rice evaluation, performed by the Contracting Officer, revealed Guardian Moving and Storage, Co. as the low-priced offeror." In the Analysis of Proposals, the contracting officer noted that:

> This procurement is a low priced technically acceptable Request for Proposal with a Past Performance Evaluation. Award will be made to the responsible low priced technically acceptable offeror with acceptable past performance. In the event that the low priced offeror is technically acceptable and has an acceptable past perform-

ance rating, award shall be made to that offeror. No other proposals will be considered for award at this point and the evaluation process will end.

The contracting officer determined the evaluated price for each of the offerors' revised proposals to be:

| | |
|---|---|
| Guardian [18] | $1,588,180.00 |
| MVS alternative | $[deleted] |
| MVS | $[deleted] |
| Platinum Services, Inc. | $[deleted] |
| Freight Hub, Inc. | $[deleted] |
| IGCE | $[deleted] |

After analyzing the revised proposals, the contracting officer determined that Guardian's revised price proposal was the lowest priced offer.

The contracting officer noted that "[o]ffers were evaluated for price reasonableness using price analysis in accordance with FAR 15.305(a)(1). Adequate price competition exists for this requirement and therefore comparison of the competitive offers is considered sufficient to establish price reasonableness." The contracting officer also indicated that "[t]he difference between Guardian's proposal and the next low offeror's—Metropolitan Van & Storage (MVS) is $[deleted] or [deleted]%."

The contracting officer also evaluated the difference between the IGCE and Guardian's revised proposed price. The IGCE for the solicitation was $[deleted]. The contracting officer explained that the IGCE was based on the storage rates on file with the Regional Storage Management Office and "[t]hese rates are high due to the lower volume stored, and therefore Guardian's proposal is substantially lower than the IGCE. Guardian will be storing upwards of 10,000,000 pounds of storage under this contract, as opposed to the contractors under TOS [tender of storage] that normally store up to 1.5 million pounds or less."

As the contracting officer explained:

> Although Guardian Moving and Storage Company is substantially lower than the IGCE [Independent Government Cost Estimate], there is less than [deleted]% difference between Guardian's proposal and the next lowest offeror's. There is no doubt that Guardian Moving and Storage understands the scope of work and performance required under this RFP. This determination is supported by the fact that 1) there were no substantial revisions to the current PWS [Performance Work Statement] under RFP W81GYE–08–R–0006, 2) Guardian Moving and Storage Company proposed similarly low rates under the previous procurements (DAMT01–02–0030 and W81GYE–07–D–0021) [the East Coast Contracts], and 3) Guardian Moving and Storage Company has consistently met the Government's requirements under the current NTS [non-temporary storage] contracts (DAMT01–02–D–0030 and W81GYE–07–D–0021).

The Price Negotiation Memorandum also indicated that, "[s]ince the low offeror [Guardian] currently holds two NTS contracts with SDDC (East Coast) and will be storing over 10,000,000 pounds (greater volume stored compared to contractors under RSMO [Regional Storage Management Office] storage program) of HHG/UB for up to seven (7) years, Guardian was able to propose a lower overall price."

In addition, the contracting officer discussed [deleted] and whether the government would be at risk of having to pay unreasonably high prices, or at risk for Guardian failing to perform under the contract. The contracting officer examined whether Guardian could perform under the contract [deleted], stating, "Guardian [deleted], and maintaining satisfactory performance." Addressing whether the government would be at risk of having to pay unreasonably high prices, the contracting officer concluded:

> I was initially concerned about the labor rate of $[deleted] (base) and $[deleted] (options) proposed by Guardian, but considering that labor provided under this line item

18. The contracting officer noted one pricing error in Guardian's revised proposal; Guardian had miscalculated the distance from its proposed storage facility to the Port of Oakland. The contracting officer recalculated the drayage rate using the correct distance for Guardian's revised proposal and evaluated Guardian's revised proposal with the correct rate, resulting in the above price proposal for Guardian.

will be subject to the Contracting Officer's Representative's [COR] approval and would only be necessary under certain conditions outlined in the performance work statement, I determined that Guardian could not abuse this line item. I concluded that the Government would not be at risk as a result of the Labor line item cost because of the COR oversight/approval and the Government would not incur a substantial expense for the labor line item.

Plaintiff argues that SDDC was required, but failed to perform, an unbalanced pricing analysis as required by FAR 15.404–1(g)(2), because Guardian's price proposal contained [deleted]. The defendant and intervenor contend that the contracting officer properly performed such an analysis and properly concluded that Guardian's proposal was not unbalanced. In this regard, FAR 15.404–1(g)(2) states that:

All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall—

(i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

48 C.F.R. § 15.404–1(g)(2), "Unbalanced pricing."

The contracting officer noted in the Price Analysis Report that Guardian's proposal contained [deleted], but determined that Guardian [deleted], and that Guardian "has consistently met the Government's requirements under the current NTS [non-temporary storage] contracts (DAMT01–02–D–0030 and W81GYE–07–D–0021)." SDDC concluded that Guardian's proposal was not unbalanced, and that "Guardian's proposed offer of $1,588,180.00 is considered fair and reasonable." In addition to the Price Analysis Report, SDDC concluded in the Price Negotiation Memorandum that, "[t]he determination that the total price was reasonable was based on 1) a comparison of all offerors' proposed rates and 2) comparison to current tendered rates on storage for NTS [non-temporary storage] and 4)[sic] comparison with the Independent Government Cost Estimate (IGCE)."

A comparison of the prices proposed by various offerors can lead an agency to a proper, supportable conclusion that the price of the low offeror is fair and reasonable, and that, therefore, award can be made to that offeror. In the present case, however, plaintiff correctly argues that "Guardian's prices were so low because Guardian misunderstood or chose to ignore that the RFP [solicitation] required a warehouse that could store 15 million pounds of HHG/UB," for up to 9 years and 6 months. Those requirements were not amended prior to submission of the revised proposals and both requirements were to be in place at the time of proposal submission and contract award, albeit a contingency arrangement was permissible under the solicitation, with the only contingency for a lease permitted that an offeror did not receive the contract award.

In the case before the court, the contracting officer concluded, that "[t]here is no doubt that Guardian Moving and Storage understands the scope of work and performance under this RFP." Plaintiff's argument regarding the inadequacy of the price evaluation raises serious questions. The evaluation approach of the solicitation specifically noted that an unrealistically low price may reflect a lack of understanding of the requirements. This court has found that Guardian, in fact, misunderstood the requirements of the solicitation, which required a lease committing to the storage of up to 15 million pounds of storage, while Guardian offered a lease committing to the storage of only up to 8 to 9 million pounds of storage. Adequate price competition can provide support for a proper conclusion that the low offer is fair and reasonable, but not in this case. Guardian, as well as other offerors, misunderstood the requirements of the solicitation. Although MVS committed to storing up to 15 million

pounds of storage, with 196,894 square feet of warehouse space, Guardian committed to storing only approximately 8 or 9 million pounds with 108,546 square feet of warehouse space. Platinum Services, Inc. offered 60,000 square feet of warehouse space with an opportunity to lease up to 200,000 square feet more and Freight Hub, Inc. included in its proposal a lease agreement for 20,500 square feet of warehouse space. The wide variations of warehouse space proposed indicate that a number of offerors, and not just Guardian, appear to have misunderstood the requirements of the solicitation. Price competition among offerors is not the end of the analysis when offerors demonstrate differing views of the solicitation requirements in their offers, such that the competition is flawed. The court agrees with the plaintiff that the contracting officer arbitrarily and capriciously found Guardian's price proposal to be reasonable, even though, as the court has found, Guardian made a non-conforming offer.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record is granted, in part. Defendant's and intervenor's cross-motions for judgment on the administrative record are denied. SDDC's award under the amended solicitation to Guardian of the Second West Coast Contract is **VACATED.** SDDC shall determine if it will evaluate the next responsible, low priced, technically acceptable offeror, with acceptable past performance or if it will amend the solicitation and resolicit proposals.

Vacating Guardian's award is a partial remedy, and the court will entertain a motion from MVS for award of bid preparation and proposal costs. In the motion, MVS shall include a detailed statement of its bid preparation and proposal costs. In lieu of a decision by the court, the parties may file a stipulation of bid preparation and proposals costs with the court.

The Clerk of the Court shall assign to the undersigned Judge any future protests involving the same parties and the same subject matter. If a future protest is filed, the parties shall indicate in their filing that the case is related to the earlier protest in this court and that it shall be assigned to the undersigned.

**IT IS SO ORDERED.**